THIRD NAT. BANK IN NASHVILLE *et al. v.* NASHVILLE
TRUST Co. *et al.*

(*Nashville,* December Term, 1949.)

Opinion filed July 15, 1950.

CHARLES L. CORNELIUS, W. OVID COLLINS, Jr., and K. HARLAN DODSON, Jr., all of Nashville, for appellant.

BASS, BERRY & SIMS, and F. A BERRY, Jr., all of Nashville, for appellees.

Mr JUSTICE GAILOR delivered the opinion of the Court.

The bill in this cause was filed by the Third National Bank in Nashville, as substitute trustee, against the Nashville Trust Company, on the charge that by investing trust funds in bonds of the International Match Company and the Missouri Pacific Railway, the defendant, during its term and tenure as trustee, had been guilty of a technical breach of trust by investment in ineligible

securities. The defendant resigned as trustee and was formally discharged as such in the County Court in 1935, and the complainant was formally appointed substitute trustee at that time. By its answer, the defendant pleaded the Six-Year Statute of Limitations, Code Section 8600, and the cause was heard below on bill and answer and a stipulation of facts which are undisputed. After hearing the cause the Chancellor delivered a well-considered opinion which has come up with the record, sustained the plea of the Six-Year Statute of Limitations and dismissed the bill. The complainant has perfected this appeal.

The only two questions presented are: (1) Is the Six-Year Statute of Limitations applicable, and (2) If we hold that it is not, was the defendant guilty of a technical breach of trust and the investment of trust funds in ineligible securities?

Shortly stated, the pertinent facts are these: In 1922, J. O. Cheek executed an express written trust naming the American Trust Company corporate predecessor of the defendant, as trustee. On the 26th day of September, 1928, in accordance with the terms of the trust instrument, the trust was terminated, except as to two children of J. O. Cheek, William F. Cheek and Joel O. Cheek, Jr. Thereafter, in accord with rights given by the instrument to this *cestui que* trust, William F. Cheek and Joel O. Cheek, Jr. removed the defendant as trustee, and had the Third National Bank appointed as successor and substitute trustee. The proceeding was had in the County Court of Davidson County, and the order of resignation by the Nashville & American Trust Company, predecessor of defendant, its discharge and the appointment of the Third National Bank of Nashville as sub-

stitute and successor trustee, was entered on November 5, 1934. The order of the Court is an exhibit to the bill and a pertinent part of its provisions is as follows: "Upon the entry of this decree and the delivery to the said Third National Bank of Nashville, Tennessee, as Trustee, of all property, effects and money belonging to said beneficiaries under said trust estate by the said Nashville & American Trust Company the said Nashville & American Trust Company will be discharged and exonerated of all future liability, with respect to said trust estate, but the question of the liability, if any, of the Nashville & American Trust Company with respect to the management of said estate and the investment of trust funds, up to and until the entry of this decree and the delivery of said trust property to said Third National Bank, is expressly reserved to any proper tribunal having jurisdiction thereof."

On the same day, November 5, defendant turned over the trust securities to the complainant and took complainant's receipt therefor, with certain exceptions, the pertinent one of which is as follows: "Second—$15,000 par value, bonds of International Match Corporation, now bankrupt. Said Bonds are No. 15403, Nos. 16736 to 16744, both inclusive, Nos. 37509 and 37510, 15391, 15392, and 15393, with coupons due May 1, 1932, and subsequent coupons attached. All of said bonds have been filed with Irving Trust Company, Trustee in Bankruptcy of International Match Corporation, and on request due assignment of the rights of the American Trust Company and/or Nashville and American Trust Company, as Trustee, will be delivered to Third National Bank, Substitute Trustee, or at the election of said Trustee any receipts on said claim will be delivered when, as and if received."

It is clear from the language of this exception that on November 5, 1934, the complainant knew that the defendant could not deliver the International Match Corporation bonds; that they were in the hands of the trustee in bankruptcy, and by the exception the substitute trustee was given an election whether it would accept a receipt for the bonds, and so, perhaps, ratify the investment which had been made by the defendant, or whether the complainant would accept dividends on the bonds from the bankruptcy as and when the defendant received them.

With the election before it, there was apparently a delay for about a year and until July 25, 1935, when attorneys for the complainant wrote defendant with regard to the latter's investment of trust funds in the International Match and Missouri-Pacific bonds, as follows: "It is the contention of the present trustee and the beneficiaries that the above investments were and are unauthorized and not in accordance with the law. Therefore, we hereby offer said bonds to you at the price you, as Trustee, paid for them, plus such interest as has not been collected."

Though in terms this letter applied to investments in the Joel Cheek trust, it applied equally to the William F. Cheek trust, since identical bonds and identical investments had been made in both. To this letter of July 25, 1935, the defendant through its attorney, replied by letter, "which denied all liability in the premises." Immediately after this letter, suit was filed in the Chancery Court of Davidson County in the Joel Cheek trust case. This suit was pending in the Chancery Court of Davidson County until 1948, when it was terminated by a voluntary settlement of the parties. No suit was ever filed in the William F. Cheek trust until the filing of the pres-

ent bill after the compromise decree in the other case on November 1, 1948.

On October 26, 1937, because certain dividends had been paid by the trustee in bankruptcy on the International Match Corporation bonds to the defendant, what is termed in the briefs a "non-prejudicing agreement" was entered into between complainant and defendant by which it was provided that the dividend checks paid to defendant should be turned over to the complainant, and ". . . that the acceptance of such check will not in any way prejudice the rights of the said Third National Bank in Nashville, Trustee, or the trust estate, or of W. F. Cheek, individually, to make any claim at a later date against the Nashville Trust Company, or any other parties, based upon the charge that the International Match Corporation bonds were purchased for such trust estate illegally, or without authority."

On June 17, 1936, a formal agreement between the attorneys of the parties had been executed, which was styled a "non-prejudicing agreement," and provided: "Now, therefore, in consideration of the premises, it is agreed by and between the parties that the Third National Bank, Trustee, shall forthwith cash said checks and hold the funds in trust to be accounted for hereafter in accordance with the decision of the courts in said case or cases, and may invest said funds in accordance with the terms of said trust instrument, but such investment shall be without responsibility on the part of the Nashville & American Trust Company and the American National Bank; and the receipt of said checks and the cashing of same by Third National Bank, Trustee, shall in no way prejudice or affect its rights as Trustee against the Nashville & American Trust Company and the Ameri-

can National Bank in said matters and shall likewise in no way prejudice or affect the rights and defenses of the Nashville & American Trust Company and American National Bank in said case or cases.''

In accord with these agreements dividend checks from time to time were paid over by the defendant to the complainant until 1947 when, apparently, the liquidation of the bankrupt estate was completed and there was a statement at the time of the payment of the last dividend, that it ''completed the accounting.''

Complainant contends, and supports the contention with authority, that it has a double remedy, that it could either refuse to accept the security purchased by the predecessor trustee and sue for the amount expended for such security, on the theory that the alleged illegal security was purchased out of the trustee's own funds and not with trust funds, or that the successor trustee could accept the alleged illegal investment and the securities evidencing the same as the property of the trust estate, and then sue for damages. Whether this contention was true in the first instance, we are not called upon to decide, because it clearly appears from the language of the letter of July 25, 1935, from attorneys of the complainant that the complainant made its election offering the alleged illegal bonds to the defendant for the purchase price plus such interest as had not been collected. The defendant rejected this offer and denied all liability. By execution of the ''non-prejudicing agreements'' the complainant reserved its right to file suit immediately, and it is entirely contrary to the tenor and language of these non-prejudicing agreements to construe them as holding that the complainant received the dividend checks with a condition that if the funds derived from the liqui-

dation of the International Match Corporation did not indemnify the complainant that the latter would hold defendant for the balance of the loss. In our view, not only the language of the agreements themselves, but the action of the parties in the Joel Cheek case, makes such construction of these agreements impossible.

In summary, we have this situation: In 1934 defendant was discharged as trustee and ordered to account. Defendant undertook to account. Complainant positively and directly refused to receive a part of the trust funds or the investment thereof, charged an illegal investment and a breach of trust, and when the defendant replied by denying the illegality, and also denying all liability, the complainant did nothing for 14 years, to protect its rights or the rights of its *cestui que* trust. Receipts of the dividend checks under the non-prejudicing agreements had only the effect that those agreements said it had, which was not to prejudice the rights of either party to the controversy.

When a trustee has been formally discharged, is no longer in possession of the trust property, and notifies the *cestui que* trust, or his representative, that the trustee considered his duties and liabilities and obligations terminated, we find no authority contrary to the following statement of the rule with regard to the limitation of actions: "In order to set the statute in motion in favor of the trustee the trust must terminate, as by its own limitation or by settlement of the parties, or there must be a repudiation of the trust by the trustee and an assertion of an adverse claim by him, and the fact made known to the cestui que trust. This proposition is well established by all the numerous cases in which the question has arisen, there is no conflict of authority whatever

upon the subject." 37 C. J., Limitations of Actions, Section 267, pp., 903-904-905; 54 C. J. S., Limitations of Actions, Section 178.

The rule that no statute of limitations applies to express trusts, has been widely and loosely stated. The equitable theory upon which the rule was based was that since in equity, the *possession* of the trustee was the possession of the *cestui que* trust and so could not be adverse, that no legal statute of limitations could commence to run until the possession was adverse. That the rule is limited to the time that the trustee is in possession of trust funds, and to the continuing relation of the parties as trustee and *cestui que* trust, is abundantly clear from the early cases cited in Judge Catron's opinion in *Armstrong's Heirs* v. *Campbell,* 11 Tenn. 201, 24 Am. Dec. 556. Our research was limited by the availability of these old cases to *Beekford* v. *Wade,* 17 Ves. 96, and *Melvy* v. *Cawley,* 4 Price 107. In the course of his opinion, Judge Catron said, 11 Tenn. at page 227: "Although a trustee cannot, in general, set up his possession in opposition to his cestui que trust, or plead the statute of limitations against him, so long as the relation of trustee and cestui que trust subsists between them, yet if that relation is once dissolved, or if the trustee to the cestui que trust notice that he intends to hold in opposition to him, the statute of limitations will run."

Using the situation in *Armstrong's Heirs* v. *Campbell,* supra, to illustrate when the statute of limitations would and would not run, Judge Green said in the course of his opinion in *Haynie* v. *Hall's Executor,* 24 Tenn. 290, at page 293, 42 Am. Dec. 427: "In that case Campbell acted under a contract with Armstrong, and the court

held that he was an express trustee, and was not protected by the statute of limitations; but Trimble, who purchased for Campbell with a knowledge of the trust, but who had nothing to do with Armstrong, was regarded as a trustee by implication of law, and it was held that the statute of limitations was a bar to a recovery against him. That case presents the very principle of the case before us. The executor of Humphreys is an express trustee; but he pays over the money to Haynie, who becomes a trustee by operation of law. The executor could not plead the statute of limitations, because his possession was the possession of the complainants; but Haynie is protected by the statute, because his possession was adverse to the complainants and for himself.''

In the recent case of *Church of Christ Home for Aged Inc.* v. *Nashville Trust Co.*, 184 Tenn. 629, at page 643, 202 S. W. (2d) 178, 184, Chief Justice Neil applied the rule when he said: ''But when she repudiated the trust, she thereby gave notice to the petitioners. remaindermen, that she was holding all the property in her own right and adversely to them. Now by all the authorities, where a person holds property for himself and others, either as joint tenants, tenants in common, or holds it in trust, the statute of limitations commences to run as of the time such holder gives notice of his repudiation of such relationship and claims ownership of the property adversely to all others.''

In the case of a direct, express and continuing trust, the statute of limitations does not run between the trustee and the *cestui que* trust as long as the trust subsists. Thus the statute of limitations will not begin to run in favor of the trustee until the trust terminates, as by its own limitation, or by settlement of the

parties. *Mayfield* v. *First Nat'l. Bank of Chattanooga,* 6 Cir., 137 F. (2d) 1013. Compare *Sprigg* v. *Wilmans,* 204 Ark. 863, 165 S. W. (2d) 69; *Knapp* v. *Knapp,* 15 Cal. (2d) 237, 100 P. (2d) 759; *McCaw* v. *McCaw,* 268 App. Div. 866, 50 N. Y. S. (2d) 766; *Teachey* v. *Gurley,* 214 N. C. 288, 199 S. E. 83.

Since appellant contends that the appeal is limited to a consideration whether the Six-Year Statute of Limitations applies, we have not discussed the application of the equitable doctrine of laches as it applies to this successor trustee, who for more than 14 years knew the rights, if any, of its *cestui que* trust, and took no steps to protect them. The bill makes no attempt, whatever, to explain why the complainant in the Joel Cheek case took prompt steps to protect the interest of its *cestui que* trust and to preserve the trust fund, and in the present case, took no steps, whatever. It is implied that the parties agreed that the outcome of the Joel Cheek litigation would control the issues in the present case, but such argument is entirely without support in the documents passing between the parties, and we agree with the holding of the Chancellor, that

"Complainant insists that it was the intention and purpose of this agreement (non-prejudicing agreement of June 1936) that the dividends received would be accepted by it and credited against any loss which might occur on account of the investment, and would be accounted for in accordance with the decision in the Joel Cheek litigation. Further, that it was the clear intent of the agreement to toll the running of the statute pending said Joel Cheek litigation which was instituted on November 1, 1935 and involving identical facts.

"The Court cannot agree with complainant's contentions. The record shows that the agreement was prepared by the solicitors of the complainant and defendant, and if it had been the intention of the parties to have the matter determined by the Joel O. Cheek case, certainly the agreement would have been specific on this point. Instead, said agreement states that 'It shall likewise in no way prejudice or effect the rights or defenses of the Nashville and American Trust Companies or the American National Bank in said case or cases.' At the time of the execution of this document, only one case was pending. Rather than having the effect of tolling this statute, or having one suit determine the issue, the wording of said agreement seemed to infer other litigation was expected."

For the reasons stated, and under the authorities cited, we agree with the Chancellor that the Six-Year Statute of Limitations applies, and the assignments of error are overruled and the decree affirmed.

All concur.