Norma Frances Raoul CLARK et al. (Original Appellants),

v.

AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHATTANOOGA (Original Appellee).

Court of Appeals of Tennessee, Western Section.

Aug. 30, 1974.

Certiorari Denied by Supreme Court July 7, 1975.

Supreme Court Denied Petition to Rehear Aug. 11, 1975.

Leonard R. Tanner, Jr. and Richard P. Jahn, Chattanooga, for appellants.

Jere T. Tipton, Miller, Martin, Hitching, Tipton, Lenihan & Waterhouse, John P. Gaither, Witt, Gaither, Abernathy & Wilson, Chattanooga, for appellee.

NEARN, Judge.

This is a trust case involving an alleged breach of trust and it is the second time that the matter has come before this Court.

Previously, this Court remanded for additional findings by the Chancellor.

In the original complaint, filed in 1964, the beneficiaries of express trusts charged the defendant Trustee, American National Bank and Trust Company of Chattanooga, Tennessee, with negligence in the exchange of certain stocks held in trust; in failing to prevent the redemption of the exchanged stock by appropriate court action; and breach of trust.

The main thrust of the complaint was that the Trustee had committed a breach of trust in 1944 when certain shares of trust stock were exchanged for a different type of stock in the same corporation. Prior to the complained of 1944 transfer of stock the Trustee held shares of Cavalier Corporation "no-par" common stock. These shares were voting shares with no dividend preference and would share equally on dissolution of the Corporation. In 1944 the "no-par" common stock was voluntarily exchanged by the Trustee for a like number of what was termed "$100.00 par value common stock". The par value stock enjoyed dividend preference and was subject to redemption by the Corporation.

In 1963 Cavalier called in and redeemed the $100.00 par value stock at $100.00 per share. Approximately four months thereafter Cavalier was sold to Seeburg Corporation for approximately 12 million dollars and Cavalier was liquidated. The holders of common stock in Cavalier participated in the division of the sale proceeds upon dissolution while the former holders of $100.00 par value stock did not. This fact precipitated this suit.

In addition to charging a breach of trust in the 1944 transaction, complainants contended at the first trial that the "$100.00 par value common stock" had the right to participate with other common shareholders on liquidation.

At the first trial the Trustee contended that the breach of trust claim was barred by the doctrine of laches and even if it were not, there had been no breach. Further, the $100.00 par value stock was not entitled to share upon liquidation with the no-par common stock.

The Chancellor held: (a) the "$100.00 par value common stock" was not true common stock but was preferred as to dividends and its par value; (b) upon liquidation it did not share with the common stock in the overage after payment of its par value; and (c) the plaintiffs were barred by the doctrine of laches on the breach of trust issue and, consequently, made no fact finding on that point.

On appeal, we affirmed the Chancellor's holding regarding the nature of the "$100.00 par value common stock", but reversed the Chancellor's holding regarding the application of the doctrine of laches and remanded for a finding of fact on the pretermitted issue.[1]

On remand, the Trustee, having lost the issue regarding laches, raised the issue of the statute of limitations as set out in T.C.A. § 28–309, and again insisted that the facts did not constitute a breach even if the claim was not barred by the statute of limitations.

The Chancellor has filed his finding of fact and conclusions and held that T.C.A. § 28–309 was not a bar to the suit and that the Trustee had committed a breach of trust in 1944 in exchanging the "no-par" value stock for the "$100.00 par value stock". Judgment in the amount of $3,941,-799.74 was rendered against the Trustee.

Now the Trustee appeals and insists that the Chancellor erred in not sustaining the plea of the statute of limitations as well as in holding there had been a breach of trust. In addition, it is also insisted that the Chan-

---

1. In an effort to have this Opinion conform to some degree of reasonableness in length, we will not reiterate here our reasons for our previous holding, as a copy of our previous Opinion may be obtained from the Clerk of this Court by those who have an interest in that portion of these proceedings.

cellor erred in the manner of assessment of damages and interest.

For an understanding of this matter it is necessary to give some history of the trusts involved.

Gaston C. Raoul, uncle of Anne Raoul and Norma Raoul, planted the seed of the trusts in 1932. In that year, Gaston Raoul, the President of Tennessee Furniture Company and its prime movant, gave in trust to the defendant Trustee 124 shares of the company's no-par value common stock.[2] The trust was for the benefit of his nieces, Anne and Norma Raoul, the complainants, and their father, Norman Raoul, who was Gaston's brother.

Subsequently, Gaston purchased from Norman his brother's interest in their father's (W. G. Raoul) estate. Gaston then gave in trust as additional corpus this interest, which included 160 shares of Cavalier no-par value common stock.

Complainants' grandmother, Mary M. Raoul, by testamentary disposition increased the trust corpus by 39 shares of Cavalier no-par value common stock.

Thus, it may be seen that at this point there were 323 shares of Cavalier no-par value stock held in trust. The trust provided that it was to terminate upon the youngest of the nieces reaching twenty-five years of age and the death of their father Norman Raoul, but in no event prior to Norman's death. Beneficiary Anne Raoul was born June 2, 1921, and Norma was born August 15, 1929. Norman Raoul died October 15, 1956.

In late 1949, prior to Norman Raoul's death, Gaston Raoul, the settlor became of the opinion that it would be better if the corpus was held in trust for the lifetime of his nieces instead of being distributed to them upon the death of their father, Nor-

man Raoul. Therefore, Gaston proposed to deposit 50 shares of $100.00 par value shares of Cavalier stock[3] in a trust if Anne Raoul, who was over 21 years of age, would agree to place her expected share of the first trust, when that trust terminated, in trust with the 50 shares offered by Gaston. He also proposed to deposit an additional 50 shares of the same stock in that trust if Norma would likewise agree and would ratify the agreement upon reaching 21 years of age. Both Anne and Norma agreed; with Norma confirming the new trust arrangements subsequent to attaining majority. Of course, Norman Raoul, a beneficiary of the first trust, was not and could not be a party to the agreement as the first trust, according to its terms, was to terminate upon his death and the corpus distributed to his daughters. Gaston Raoul had in this manner placed 100 shares of $100.00 par value Cavalier stock in trust; which trust existed contemporaneously with the first trust until the first fell in upon the death of Norman in 1956. The named trustee of the second trust was the same as the first, that is, the defendant, the American National Bank and Trust Company of Chattanooga.

Hence, at one point in time there existed two separate trusts with the same named Trustee. One, the first in time, consisting of 323 shares, which is the subject of this suit, and the second consisting of 100 shares with which this litigation is not concerned.

While the Trustees of the trust were the same, neither the corpora, settlors, beneficiaries, or terms were the same. In the first trust, we may consider Gaston C. Raoul as the settlor with Anne, Norma and Norman Raoul as named beneficiaries with termination conditioned upon the death of Norman. In the second trust Gaston, Anne and Norma Raoul are the named settlors with Anne

**2.** Tennessee Furniture later came to be known as Cavalier Corporation and in all references in this Opinion all stock will be referred to as that of Cavalier.

**3.** In the 1944 transaction, both the trustee and Gaston Raoul had voluntarily ex-

changed their no-par value stock for $100.00 par value stock, so at the time of the new agreement the 100 shares offered by Gaston and the 323 held by the Trustee were all $100.00 par value shares.

and Norma as the named beneficiaries with termination upon the death of Anne and Norma. The general purpose of the first trust was to provide for the maintenance and education of Norma and Anne Raoul and the maintenance of their father, Norman, if needed. However, the dominant purpose of that trust was to provide for Norma and Anne. The sole purpose of the second trust was to provide for Norma and Anne. The second trust contained a spendthrift clause while the first did not. Also, there existed contemporaneously for a time two distinct corpora; the first consisting of 323 shares and the second consisting of 100 shares.

Upon the death of Norman Raoul on October 15, 1956, the defendant Trustee transferred the 323 shares from the first trust to the corpus of the second.

Now, a brief summary of the events of 1944. Cavalier Corporation represented the life's work of Gaston C. Raoul. He was justly proud of his business and in 1944 began to contemplate about its future when death would remove him as captain of the ship. Over the years Cavalier had done its banking with the defendant bank. Mr. E. Y. Chapin, a director of the bank and a trust officer, became a personal friend of Gaston Raoul. Chapin also owned a few shares of Cavalier stock. In the year 1944 both Chapin and Raoul were members of the board of directors of both the defendant bank and Cavalier. Gaston conceived the idea of the $100.00 par value stock. His fear was that after his death the Corporation would be "absentee" owned, that is, those who were actively engaged in the day to day operation of the Corporation would not be common shareholders and as a consequence the business would suffer for lack of real concern by those who were operating it. Also, as will be later shown, the exchange of common stock for par value stock would have definite tax benefits for Gaston Raoul. Therefore, he proposed that the Corporation offer to exchange $100.00 par value stock with dividend preference on a share-for-share basis for common stock.

The ultimate hoped for result would be that those who did not actively contribute to the running of the business would exchange their common stock for the preferred stock, which would have the effect of making the common ownership stock available by purchase or bonus incentive to those who actually ran the business. Gaston Raoul discussed and conferred with E. Y. Chapin about this plan. The offer was made to the stockholders in 1944 and nearly all of the "absentee" owners, including the defendant Trustee and Gaston Raoul, exchanged the no-par value common stock for the $100.00 par value preferred.

It is not in dispute that T.C.A. § 28–309 is applicable to trusts. See *Third Nat. Bk. v. Nashville Trust Co.* (1950), 191 Tenn. 123, 232 S.W.2d 7. The statute provides in effect that this action "shall be commenced within six (6) years after the cause of action accrued."

It has been generally stated that a statute of limitations does not apply to express trusts. However, the misconception that the foregoing generality has created, was interred by our Supreme Court in the case of *Third Nat. Bk. v. Nashville Trust Co.*, supra, when the Court stated:

"The rule that no statute of limitations applies to express trusts, has been widely and loosely stated. The equitable theory upon which the rule was based was that since in equity, the *possession* of the trustee was the possession of the *cestui que* trust and so could not be adverse, that no legal statute of limitations could commence to run until the possession was adverse. That the rule is limited to the time that the trustee is in possession of trust funds, and to the continuing relation of the parties as trustee and *cestui que* trust, is abundantly clear from the early cases cited in Judge Catron's opinion in *Armstrong's Heirs v. Campbell*, 11 Tenn. 201, 24 Am.Dec. 556. Our research was limited by the availability of these old cases to *Beekford v. Wade*, 17 Ves. 96, and *Melvy v. Cawley*, 4 Price 107. In the

course of his opinion, Judge Catron said, 11 Tenn. at page 227: 'Although a trustee cannot, in general, set up his possession in opposition to his cestui que trust, or plead the statute of limitations against him, so long as the relation of trustee and cestui que trust subsists between them, yet if that relation is once dissolved, or if the trustee to the cestui que trust notice that he intends to hold in opposition to him, the statute of limitations will run.' "

In the course of that Opinion the Court quoted with approval the rule as set out in Corpus Juris as follows:

" '*In order to set the statute in motion in favor of the trustee the trust must terminate, as by its own limitation or by settlement of the parties,* or there must be a repudiation of the trust by the trustee and an assertion of an adverse claim by him, and the fact made known to the cestui que trust. This proposition is well established by all the numerous cases in which the question has arisen, there is no conflict of authority whatever upon the subject.' 37 C.J., Limitations of Acts, Section 267, pp., 903–904–905; 54 C.J.S. Limitations of Actions, § 178." (191 Tenn. 130–31, 232 S.W.2d 10) (Emphasis supplied).

By its terms, the first trust terminated on October 15, 1956, upon the death of Norman Raoul. The second trust was already in existence on that date. The second trust cannot be simply an extension of the first trust as argued by counsel for the beneficiaries. The only common denominator between the two trusts is the name of the Trustee, American National Bank and Trust Company of Chattanooga. There is no proof in this record that the Trustee attempted in any manner to induce the beneficiaries of the first to create the second for any reason, much less for the reason of "covering up" any past mistakes. The second trust was based on the agreement between the nieces and their uncle, that the nieces would place in a trust what was theirs personally when they were entitled to it, if their uncle would also place in

that trust 100 shares. On October 15, 1956, the corpus of the first trust became the personal property of the nieces to do with it as they saw fit. They saw fit to place that corpus in another trust already created. Therefore, the statute of limitations in this case would begin to run on the first trust on the date of its termination, October 15, 1956, for the Trustee no longer had any duties under that trust and, in effect, turned over the corpus to the beneficiaries, who had by prior agreement agreed to place it in another trust; unless it can be said that fraud is involved.

In *Bates v. Preble*, 151 U.S. 149, 14 S.Ct. 277, 38 L.Ed. 106, cited in *Hall v. DeSaussure* (1956 W.S.), 41 Tenn.App. 572, 297 S.W.2d 81, it was said, " '* * * if the fraud be secret in its nature, and such that its existence cannot be readily ascertained, or if there be fiduciary relations between the parties, there need be no evidence of a fraudulent concealment other than that implied from the transaction itself.' "

We must therefore determine if the 1944 exchange itself was a fraudulent transaction. Evidently the Chancellor was not of the opinion that the transaction of 1944 was a fraudulent transfer for he did not so find. The Chancellor held, after an exhaustive finding of fact, that the Trustee in the 1944 transaction failed in its duties as set out in Section 174 of the *Restatement of Trusts*, to wit:

" 'The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property; and if the trustee has greater skill than that of a man of ordinary prudence, he is under a duty to exercise such skill as he has.' "

In other words, the Chancellor found that the Trustee violated the prudent man rule.

█ Expert testimony was adduced on both sides of this controversy concerning the prudent advisability of exchanging or not exchanging the stock. The experts

properly viewed the exchange in the light of circumstances existent in 1944. The Trustee's expert witnesses testified in that light and not judging by hindsight were of the opinion the exchange was prudent. On the other hand, expert witnesses for the beneficiaries viewed the exchange in the same light and through the same sight and were of the opinion the exchange was not prudent. The Chancellor accepted the testimony of the latter and we cannot say the evidence preponderates against the finding that the exchange was imprudent. However, an imprudent mistake, even a bad one, does not make out a case of fraud and we hold the proof does not warrant such conclusion.

Nevertheless, it is argued that whether a mistake be fraud or not, if the cause of action is concealed from the beneficiaries, the concealment thereof is fraud and a fraudulent concealment will toll the statute. "It is not the fraud, but its concealment by the party perpetrating it, unmixed with fault or negligence on the part of him who complains, which works this result." *Woodfolk v. Marley* (1897), 98 Tenn. 467, at page 471, 40 S.W. 479, at page 480.

Absent a fiduciary relationship that concealment must be evidenced by some overt act, but where a fiduciary relationship exists and there is the duty to speak, mere silence may constitute a fraudulent concealment. Pomeroy, *Equity Jurisprudence*, 5th Edition, § 902, page 550; *Simmons v. Evans* (1947), 185 Tenn. 282, 206 S.W.2d 295; *Sewing Machine Company v. Jackson* (1885), 83 Tenn. 418.

Immediately prior to the 1944 transfer of stock, the Trustee, through a trust officer (not Mr. Chapin) discussed the matter of the exchange of stock with Norman Raoul, beneficiary of the first trust and father of the co-beneficiaries, Anne and Norma. Norman gave the Trustee permission for the transfer and stated: "It is entirely satisfactory with me to exchange any Cavalier old stock for the new Cavalier stock that you are holding in trust for my children."

The exchange in 1944 was in no manner hidden from anyone. After the exchange, the records of the Trustee indicated that the stock was $100.00 par value stock where before it had been listed simply as shares. In short, there was no physical concealment from anyone of the transaction itself.

It is the position of the beneficiaries that Mr. Chapin was of the opinion that the exchange was not in the best interest of the beneficiaries and he was under a duty to reveal to the beneficiaries any uncertainty in his mind regarding the soundness of the stock exchange. This brings us to the Chancellor's finding that the Trustee breached its duty of loyalty. On that point we copy from the Chancellor's opinion:

"The Court now deals with the contention of the plaintiffs that the Trustee violated its duty of loyalty. See: Bogert, *Law of Trusts*, Sec. 95, (Hornbook Series); 54 Am.Jur. 247, Trusts, Sec. 312. That duty is stated in Section 170 of the Restatement of Trusts as follows:

'(1) The trustee is under a duty to the beneficiary to administer the trust *solely* in the interest of the beneficiary. (Emphasis added.)

(2) The trustee in dealing with the beneficiary on the trustee's own account is under a duty to the beneficiary to deal fairly with him and to communicate to him all material facts in connection with the transaction which the trustee knows or should know.'

Further, under Comment 'p' to said Section 170, is the following, to wit:

'Action in the interest of a third person. The trustee is under a duty to the beneficiary in administering the trust not to be guided by the interest of any third person. Thus, it is improper for the trustee to sell trust property to a third person *for the purpose of benefiting the third person rather than the trust estate.*' (Emphasis Added.) See also: *Cowan v. Hamilton Nat. Bank*, 177 Tenn. 94, 146 S.W.2d 359, 367.

"It is obvious that in this case Mr. Gaston Raoul, while acting as a director of the Trustee Bank and thus onerated with the duties of undivided loyalty owed by a Trustee to his beneficiaries (Plaintiffs) was at the same time acting in *his own personal interest* in carrying out his personally devised scheme of recapitalization, the ultimate aim of which was to place equity ownership of the Cavalier Corporation in his son and close associate, Mr. Lane, while paying little or no Federal taxes.

"Eleven years later on August 2, 1954, Mr. Raoul, in a personal memorandum, stated:

'Incidentally, *Mr. Chapin disapproved of the idea in toto as being a giveaway* of the then principal owners to the no par stockholders who might elect not to exchange. I disagreed with him, and after 11 years still do. *He went along with the plan, however, like the loyal friend he always was.* W.C.R.' (Emphasis added.)

This memorandum of Mr. Raoul was with respect to the 1944 stock exchange. Said memorandum is very revealing in two respects. First, it tells us that 'Mr. Chapin disapproved of the idea in toto as being a giveaway', and, secondly, that Mr. Chapin, who handled these trusts for defendant Bank, failed to exercise in behalf of the trust beneficiaries his said judgment of disapproval but 'went along with the plan however, like the loyal friend he always was.' These actions by Mr. Raoul and Mr. Chapin appear to be precisely what Section 170 of the *Restatement of Trusts* states is a violation by the Trustee of its duty of loyalty.

"It appears that Mr. Raoul viewed the plan almost solely from a standpoint of achieving his own personal estate objectives rather than from the standpoint of *Trustee for the plaintiffs.* It is understandable how Mr. Raoul could disagree with Mr. Chapin as indicated by said memorandum because to Mr. Raoul the plan was accomplishing *his* estate plan objectives. He did not wish his estate to enlarge as the company grew. From the standpoint of death taxes, the plan had the effect of shifting high value assets (no par common stock, book value of $298.05) out of his estate so that he might hold low value assets ($100.00 par common stock) and thereby defeat death taxes. If he had made an *inter vivos* gift he would have incurred Federal gift taxes and the objectives of his bounty would not have received as much as they would have received under his plan. But Mr. Chapin must have viewed the whole scheme from a different aspect; his only personal interest was friendship for Mr. Raoul. The new stock was subject to redemption for $100.00 per share, representing a "give away" of $198.05, of book value and the earnings and dividends that went with it. Mr. Gaston Raoul did not regard this as a give away *for him* because he was giving *to his son and business associate, Mr. Lane,* and his family was retaining what he deemed sufficient voting control to protect their remaining investment. Finally, the Trust assets were always vulnerable to redemption for the sum of $32,300.00.

"Nowhere does the record indicate that the Trustee Bank ever disclosed to anyone acting on behalf of the plaintiffs the effects that the exchange of stock hereinabove outlines would have on these trusts. See: *Knox County v. Fourth & First Nat. Bank, supra* [181 Tenn. 569, 182 S.W.2d 980], at P. 986. It seems of great importance to the Court that the Trustee Bank was chargeable with notice not only of what Mr. Chapin knew, but also of what Mr. Gaston Raoul knew about the recapitalization plan, the prospects for Cavalier and the advantages, and disadvantages of the two stock issues, and he knew just about all there was to know."

It should be noted that in Gaston Raoul's memorandum, upon which the Chancellor placed so much weight, it was stated that

Chapin "disapproved of the idea in toto, as being a giveaway by the then principal owners to the no par stockholders who might elect not to exchange." The memorandum was a note written by Gaston to himself evidently in 1956 when he was in a reminiscing mood and was in reference to a letter of 1944 that had been transmitted to the directors of Cavalier explaining the nature of the then proposed new issue of $100.00 par value stock. The letter had nothing to do with trust stock but was the embodiment of the idea for the "new" stock. It appears to us that Gaston Raoul was saying that Chapin disapproved the idea of the new $100.00 par value stock because it was a "giveaway" of ownership by the then principal owners but that Chapin eventually went along with the plan. If this be a proper interpretation of the minds of Gaston Raoul and Chapin, both now being dead and unable to tell us differently, what does that opinion of disapproval of the stock issue and the "giveaway" feature of equity ownership have to do with the manner which Chapin was obligated to view the securities from an investment standpoint? Issues of non equity ownership stock, with preferred dividends could legitimately be considered by a trustee as a better trust investment than equity ownership stock, dependent upon circumstances. In other words, Chapin may have felt that Gaston and the other large equity owners may have been cutting their own throats as to real ownership in the Corporation; but as Trustee entrusted only with relatively few shares of stock with no real ownership say-so, also have felt that the interests of his beneficiaries would be better served with preferred income. Chapin could disagree with the wisdom of Gaston's plan in so far as Gaston was concerned, and still be of the opinion that the new stock issue was best for his beneficiaries. It is interesting to note that Chapin also exchanged the few shares of common stock that he and his wife owned for the $100.00 par value stock about the same time the trust stock was exchanged. Chapin handled his personal stock in the same manner as he did that of the trust. If he intended to help Gaston at the expense of the trust by the exchange he also intended to injure himself.

There is no proof in this record, other than the various interpretations placed by counsel on the Gaston memorandum, that would indicate that Chapin ever acted as Trustee without the best of motives. His judgment and that of the other members of the trust committee of the defendant bank may have been wrong, as evidently it was; and they may not have given the then present and future prospects of Cavalier their proper due, as evidently they did not; but we are unable to find proof upon which we could base the conclusion that Chapin had knowledge of his mistake and failed to reveal such to the beneficiaries.

■ Therefore, in so far as the actions of Chapin are concerned, we disagree with the Chancellor and do not find that Chapin breached his duty of loyalty to the trust.

We now turn to that portion of the Chancellor's holding wherein he held that since Gaston was a director of the Trustee bank he was also a Trustee of the trust and any knowledge he had concerning the advisability of the exchange was imputed to the bank as Trustee.

Gaston Raoul was not a trust officer of the bank. He was a director and, as far as this record is concerned, he did not act in an advisory capacity or otherwise in the management of the trust department. Nothing that he knew about his own Corporation was ever acquired by virtue of his capacity as director of the bank. There is no proof that Gaston Raoul ever assumed to act in any manner in the capacity of a Trustee.

■ The general rule as stated in Fletcher's Cyclopedia, Corporations, Permanent Edition, Vol. 3, § 808, p. 72, is as follows:

"Information not acquired in the course of his employment, or by or in performance of some duty as agent or director owing to the corporation, is not imputed to the corporation, because the director is

under no obligation to communicate such knowledge to the corporation, and the corporation is not presumed to have been informed by the director of what he ascertained in that transaction. Accordingly, the knowledge of a member of the board of directors of a banking corporation cannot in law be attributed to the bank, where it does not appear that at the time he was in any way engaged in the bank's business, or acting in its behalf, . . ."

We are of the opinion that the general rule, as above stated, is the rule of this State.

The Chancellor seemed to consider the tax advantages to Gaston's estate as the personal motive which induced Gaston in some manner to sway the mind of Chapin so that the shares held in trust would be exchanged. This theory will not bear scrutiny. Whether or not the shares in trust were exchanged would have no bearing on Gaston's estate or the tax liability thereon. Gaston had already parted with the ownership of those shares, when, during his lifetime he placed them in trust. They never could become part of his estate and there would be no tax advantage to him one way or the other.

Therefore, we hold that the Chancellor was in error when he held that Gaston Raoul as Trustee had breached his duty of loyalty.

All of what we have said before being true, counsel for beneficiaries argues that the reasons we gave in our first opinion for overruling the Chancellor on the question of laches are good and sufficient reasons for not applying the statute of limitations.

It should be noted that the Chancellor was of the opinion that the statute of limitations was a good plea in bar, but he was convinced that the Court of Appeals would deny the application of the statute for the same reasons it denied application of the rule of laches in the first appeal and commented as follows:

"It is perhaps the duty of the Court to state, however, that, were it free to do so, it would sustain the plea of the statute of limitations as insisted by the defendant Bank."

In the first appeal of this case, the beneficiaries of the trust had lost in the lower court on the basis of the Chancellor sustaining the plea of laches. The appeal was directed to the Chancellor's error in applying the doctrine of laches. Of course, the appellant-beneficiaries did not raise the additional defense of the statute of limitations. Nor did the Trustee on that appeal raise the defense of the statute of limitations. The first appeal was determined on the question of laches with no mention of the statute of limitations. The issue of the statute of limitations has been first raised in this Court on this appeal. On remand, the Chancellor was perfectly free to rule upon that issue as he saw fit and it is our opinion that he should have followed his inclinations and sustained the plea.

■ Laches is a defense peculiar to Courts of equity and the doctrine is usually applied where no statute of limitations governs the case. However, on occasions the doctrine is applied to bar a stale claim prior to the running of the statute of limitations; but it should be applied in such cases when there is gross laches in the prosecution of the claim. See Bogert on Trust, Section 169 (Hornbook series); *State ex rel. v. Abernathy* (1929), 159 Tenn. 175, 17 S.W.2d 17; *Carpenter v. Wright* (1929), 158 Tenn. 289, 13 S.W.2d 51.

■ Laches is actually based on equitable estoppel and is dependent upon the facts and the equities of each individual situation. *State ex rel. v. Abernathy*, supra and *Hamilton Nat. Bank v. Woods* (1948 E.S.), 34 Tenn.App. 360, 238 S.W.2d 109. Contrariwise, there is little, if any, equity involved in a statute of limitations. Statutes of limitations are arbitrary time periods fixed by the Legislature to put at rest possible litigation after the lapse of that period fixed by the Legislature for the ben-

efit of society in general in order to promote certainty and repose.

■ Long delay alone in the prosecution of a claim is insufficient for the application of the doctrine of laches. The present circumstances of the parties must be considered. There must be actual acquiescence or that implied from the circumstances of the case, in the conduct of the defendant. Whether or not such exists is dependent upon the facts. And whether the facts are sufficient is dependent upon the Court applying those facts. One Court may reach a different conclusion than another. Initially, we could find no factual condition in the record, as we reviewed it, that would put the complainant-beneficiaries on reasonable inquiry or notice of the complained of exchange which, therefore, "tolled the running" of the doctrine of laches.

■ However, the question of the reasonableness of the opportunity to discover is not a matter for judicial conclusions when dealing with statutes of limitations as they are statutes of repose. See and compare *West v. Moore* (1952), 193 Tenn. 431, 246 S.W.2d 74; *Lee v. Harris* (1949), 188 Tenn. 373, 219 S.W.2d 892. A plea of laches and a plea of the statute of limitations are not the same thing. As in this case, laches may not bar the claim; but the statute of limitations will. See and compare *In re Estate of Darwin* (Tenn.1973), 503 S.W.2d 511.

■ Able counsel for the beneficiaries also argues that even if all the foregoing is true, which by no stretch of the imagination is conceded, the defendant bank as Trustee was obligated to sue itself when it received the corpus of the first trust on the death of Norman Raoul. This position is based on the theory that when the bank accepted the corpus from the old trust, it was obligated to check the manner in which it had previously handled the first trust, and if irregu-

larities were discovered to sue the prior Trustee which happened to be itself. Since the second trust was an express trust and not terminated, the statute of limitations has not yet begun to run against the Trustee as Trustee of the second trust. We are cited to cases which involve the duties of successor trustees. However, the bank as Trustee under the second trust was not and is not a successor trustee. Any cause of action for the mismanagement of the first trust belonged to the beneficiaries thereof upon its termination and never became the right or duty of the Trustee under the second trust, which trust was not and is not the same as the first trust.

■ For the reasons stated, we are of the opinion that the claim of the beneficiaries is barred by the statute of limitations and the Chancellor erred in not so holding. We do not reach the other Assignments of Error.

The result is that the suit will be dismissed.

The Court is of the opinion that in this case the costs below and costs of appeal are to be adjudged against the defendant bank.

So order.

Judge WILLIAM P. PURYEAR, by designation of the Supreme Court of Tennessee, took part in the hearing of this appeal in the absence of Presiding Judge C. S. CARNEY, Jr.

MATHERNE, J., and PURYEAR, Special Justice, concur.