IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 21, 2012 Session

**PAUL SHEARER ET AL. v. FRED MCARTHUR ET AL.**

**Appeal from the Chancery Court for Marion County**
**No. 7440     Jeffrey F. Stewart, Chancellor**

**No. M2012-00584-COA-R3-CV - Filed November 5, 2012**

This appeal involves an option contract under which the defendants agreed to buy a piece of property from the plaintiffs at any time. We find no error in the trial court's determination that the option contract was supported by consideration, that the plaintiffs exercised the option within a reasonable time, and that the plaintiffs did not waive the option by pursuing an inconsistent remedy. We, therefore, affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, M.S., P.J., and RICHARD H. DINKINS, J., joined.

David Thomas Black, Maryville, Tennessee, for the appellant, Fred McArthur.

Thomas Ray, Chattanooga, Tennessee, for the appellee, Paul Shearer.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

On December 9, 2006, Paul and Patricia Shearer attended a sales event held by Rarity Communities, Inc. ("Rarity") to promote the Rarity Club on Lake Nickajack, a subdivision in Marion County, Tennessee. That same day, the Shearers signed a Homesite Purchase Agreement ("HPA") to buy a waterfront lot, lot 142, in the new subdivision for $490,000. The seller of the lot was Nickajack Shores Holdings, LLC, and Rarity was the listing broker. The sale closed in January 2007, and a deed and deed of trust were recorded on February 20, 2007.

The Shearers filed this lawsuit on February 23, 2010 against Fred McArthur,

executive vice-president for sales and marketing for Rarity, and Robert Young, a sales agent for Rarity. The plaintiffs alleged that Mr. McArthur and Mr. Young induced them to enter into the HPA by promising in writing to purchase the lot from them at any time for $441,000.[1] The written option agreement ("option agreement") relied upon by the plaintiffs is as follows:

> This is a seperate [sic] agreement between 1st party of Fred McArthur and Robert Young and 2nd party of Paul and Patricia Shearer.
>
> *At any time the 1st party of Fred McArthur and Robert Young will buy back homesite #142 at the same price it was sold at the priority selection event at Rarity Club on Lake Nickajack on December 9th, 2006. Cost $441,000.
>
> /Signature of McArthur/
> /Signature of Young/
>
> Acceptance:
> /Signature of Paul Shearer/          12/9/06
> /Signature of Patricia Shearer/      12/9/06

According to their complaint, the Shearers made demand on the defendants to purchase lot 142 from them on January 22, 2010, but the defendants refused to do so.

*Testimony*

The case was tried without a jury on September 20, 2011. Mr. and Ms. Shearer both testified. Patricia Shearer described their meeting with Mr. McArthur and Mr. Young at the promotional event on December 9, 2006. According to Ms. Shearer, she and her husband told Mr. Young that they were not ready to make a decision about buying a lot that day. Mr. McArthur joined the conversation, told them about the substantial increases in value of lots in other Rarity developments, and encouraged them to buy a piece of property. When the Shearers continued to hedge, Mr. McArthur told them that he had so much confidence in the property that he would buy it back from them if they ever wanted to sell it. Mr. Shearer agreed to this deal if they would put it in writing. Ms. Shearer testified that the Shearers "never would have gone through with this [HPA] had it not been for this separate

---

[1] The difference between this figure and the total purchase price of $490,000 reflects a 10% developer credit pursuant to which the developer paid the interest on the Shearers' mortgage for approximately the first seventeen months.

agreement."

After the Shearers bought their property, the marina planned for the development had to be moved in order to meet TVA requirements. The new plan put the marina in front of lot 142. Ms. Shearer testified that, around October 2008, she and her husband told Michael Ross, the head of Rarity, that the lot was no longer the quiet, serene lot they had purchased; it was "going to be a thoroughfare for boats coming in and out of the marina and we were very unhappy." Mr. Ross offered to buy the property back from them, but no agreement was put in writing. According to Ms. Shearer, Mr. Ross stated:

> I can't do it today. I'm waiting for a deal to close, and that should happen around Thanksgiving. And he said, in the meantime I'll just make your payment until my deal closes and then I can go through with the purchase.

Mr. Ross began making payments to the Shearers. In the summer of 2009, Rarity's financial situation was in decline, and Mr. Ross told the Shearers that he would continue to make the monthly interest payments as long as he could, but he did not know how long that would be. Ms. Shearer testified that Mr. Ross had paid a total of $91,971 to them, and that she and her husband had paid a total of $120,323 to their lender.

Paul Shearer's testimony was similar to Ms. Shearer's testimony. He, too, testified that Mr. McArthur stated that he thought "this property is going to be so good that I would be willing to buy it back from you-all at any time if you ask us to do that." Mr. Young agreed to this arrangement, and the two agents went to draw up a written agreement. Asked if this option agreement was an important factor in the Shearers' purchase of the lot, Mr. Shearer stated, "It was the only factor."

Mr. Ross, the president of Rarity Communities, testified about the agreement he made with the Shearers to purchase lot 142 from them. He stated that he had been trying to make monthly payments to the Shearers and had made a total of twenty-two payments to them. Mr. Ross did not sign a written agreement to buy the lot back from the Shearers. When asked whether this was a "personal representation by you or was that one of your entities," Mr. Ross stated that "[i]t would have been one of my entities." He testified that he "didn't really specify, just one of the companies." Mr. Ross further stated that foreclosure proceedings had been brought against several of the communities developed by Rarity and that the real estate market had changed dramatically since he initially made the promise to the Shearers. It was Mr. Ross's understanding that his payments to the Shearers basically covered their interest payments.

Mr. McArthur testified that he did not remember the conversation with the Shearers

-3-

on December 9, 2006. Presented with a copy of the option agreement, Mr. McArthur stated: "It doesn't look like my signature, but I'm not denying that it could be." He denied ever agreeing to buy lot 142 from the Shearers.

When asked about his purported signature on the option agreement, Mr. Young testified that the signature "appears to be very close" to other examples of his signature. He acknowledged that he and Mr. McArthur received a commission on each sale at closing. Like Mr. McArthur, Mr. Young denied that they agreed to buy lot 142 from the Shearers.

The plaintiffs' final witness was a handwriting expert, Roy Cooper, Jr., who testified that, with machine copies such as the exhibit of the option agreement, an expert could only testify with 85 to 90% certainty. He was asked to compare the signatures on the option agreement with examples of the signatures of Mr. Young and Mr. McArthur and opined with 85% certainty that the signatures on the option agreement had been written by Mr. Young and Mr. McArthur.

*Decision of trial court*

In a memorandum opinion announced from the bench on January 31, 2012, the court issued findings of fact and conclusions of law. Specific findings relevant to the issues raised on appeal will be discussed more fully below. The court found the option agreement to be enforceable and, on March 7, 2012, entered judgment in favor of the plaintiffs in the amount of $441,000. The plaintiffs agreed to waive pre-judgment interest.[2] The plaintiffs were also ordered to execute a warranty deed transferring the property to the defendants. Mr. McArthur appeals.[3]

STANDARD OF REVIEW

In a trial without a jury, we review the trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Moreover, we "give great weight to the trial court's assessment of the evidence because the trial court is in a much better position to evaluate the credibility of the witnesses." *Boyer v. Heimermann*, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625,

_____

[2]It appears that, by making this waiver, the plaintiffs gave the defendants credit for the payments made to them by Mr. Ross to go toward their loan.

[3]Defendant Young is not involved in this appeal.

628 (Tenn. 1999).

ANALYSIS

On appeal, Mr. McArthur presents three grounds for challenging the decision of the trial court to enforce the option agreement: (1) lack of consideration, (2) failure to exercise the option within a reasonable time, and (3) election of an inconsistent remedy.

(1)

Under Tennessee law, "[a]ll contracts in writing signed by the party to be bound . . . are prima facie evidence of a consideration." Tenn. Code Ann. § 47-50-103. The burden of proof to overcome the presumption of consideration is upon the party asserting the lack of consideration. *Atkins v. Kirkpatrick*, 823 S.W.2d 547, 552 (Tenn. Ct. App. 1991). In this case, the trial court found valid and sufficient consideration to support the option agreement, specifically citing the inducement of the plaintiffs to enter into the HPA and the commissions earned by the defendants as a result of the sale.

In asserting a lack of consideration, Mr. McArthur relies on the following provision of the HRA:

14. . . . In connection with and consistent with the terms of the Development Plan, Seller represents to Buyer that:
. . .
(f) There are no other offers, by direct mail or telephone solicitation, of gifts, trips, dinners or other such promotional techniques to induce prospective purchasers or lessees to visit Rarity Club or to purchase or lease a lot in Rarity Club (and Buyer hereby confirms that no such offers have been made to induce Buyer to visit Rarity Club or to purchase the Lot).

Paragraph 14(f), however, is part of the HRA between Nickajack Shores Holdings, LLC and the Shearers. The option agreement at issue here is between the Shearers and Mr. McArthur and Mr. Young. Therefore, paragraph 14(f) has no application to the option agreement.

Mr. McArthur cites *D'Alessandro v. Lake Developers, II, LLC*, No. E2011-01487-COA-R3-CV, 2012 WL1900543, at *4 (Tenn. Ct. App. May 25, 2012), for the proposition that "nothing outside of the purchase contract and attached or associated documents should be regarded as consideration for the purchase of property." We fail to find any support for this interpretation of *D'Alessandro*. Moreover, the focus of our inquiry is upon the consideration for the option agreement, not the consideration for the HRA. Consideration

"exists when the promisee does something that it is under no legal obligation to do or refrains from doing something which it has a legal right to do." *Guesthouse Int'l, LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 188 (Tenn. Ct. App. 2010) (quoting *Brown Oil Co. v. Johnson*, 689 S.W.2d 149, 151 (Tenn. 1985)). In this case, the Shearers did something they were not legally obligated to do–i.e., entered into the HPA to buy the lot–based upon the option agreement. The Shearers' execution of the HPA and the resulting commissions to the defendants constitute legally sufficient consideration for the option agreement. *See First Am. Nat'l Bank of Nashville v. Hunter*, 581 S.W.2d 655, 659 (Tenn. Ct. App. 1978); *Robinson v. Kenney*, 526 S.W.2d 115, 119 (Tenn. Ct. App. 1973).

(2)

Mr. McArthur's second argument is that the trial court's decision to enforce the option contract was erroneous because the Shearers failed to exercise the option within a reasonable time.

The option contract was signed on December 9, 2006, and the Shearers made their first written demand for performance to the defendants on January 22, 2010. Thus, they attempted to exercise the option a little more than three years after entering into the option agreement. As Mr. McArthur emphasizes, courts generally read into a contract a reasonable time standard when the contract does not include a time for performance. *Birkholz v. Hardy*, No. W2003-01539-COA-R3-CV, 2004 WL 1801736, at *5 (Tenn. Ct. App. Aug. 11, 2004); *Moore v. Moore*, 603 S.W.2d 736, 739 (Tenn. Ct. App. 1980). In this case, the option contract states that the defendants agree to purchase the Shearers' lot "at any time." Moreover, even under a reasonableness standard, the defendants argument must fail.

The determination of what constitutes a reasonable time for performance of a contract is a question of fact. *Birkholz*, 2004 WL 1801736, at *7. Under Tennessee law, the statute of limitations for contract actions is six years. Tenn. Code Ann. § 28-3-109(a)(3). To bar a claim prior to the running of the statute of limitations based upon the doctrine of laches requires a showing of gross laches in the prosecution of the claim. *Sutton v. Davis*, 916 S.W.2d 937, 941 (Tenn. Ct. App. 1995); *Clark v. Am. Nat'l Bank & Trust Co. of Chattanooga*, 531 S.W.2d 563, 572 (Tenn. Ct. App. 1974). Gross laches requires "(1) unreasonable and inexcusable delay in filing the action; (2) loss of evidence; and (3) prejudice to the defendant." *Pac. E. Corp. v. Gulf Life Holding Co.*, 223 B.R. 523, 526 (M.D. Tenn. 1998).

After stating that demand was made by the Shearers within the six-year statute of limitations, the trial court gave the following analysis regarding laches:

-6-

Now, was there a delay or did laches result in some harm to the plaintiffs? Well, looking at this, the problems [with the development] really began around 2008, and the plaintiffs testified that they began to notice some of the things that had been promised were not done, for instance, street lights hadn't been put in, sidewalks hadn't been put in and things of that nature. And then in October of 2008, TVA required the developer to move the marina, and the marina was moved to be right in front of their lot, which would have blocked their view of the lake. . . . And so that was a significant difference, and so they attempted to work with Mr. Ross . . . .

At that time Mr. Ross orally offered to buy back the property from them and, in fact, Mr. Ross testified at that particular time he thought he was going to be able to sell a piece of property in November, and he planned to use those sales proceeds to buy this property back directly without involving the defendants in this particular case. But he said that didn't work out, that deal fell through, and so he wasn't able to do it.

After discussing Mr. Ross's interest payments, the trial court concluded that "there hasn't been an unreasonable delay" in this case. The evidence does not preponderate against the trial court's finding.

(3)

Mr. McArthur's final argument is that allowing the Shearers to enforce the option agreement violates the election of remedies doctrine. We disagree.

A plaintiff may be required to elect between remedies in order to "prevent 'double redress' for a single wrong." *Forbes v. Wilson Cnty. Emergency Dist. 911 Bd.*, 966 S.W.2d 417, 421 (Tenn. 1998) (quoting *Barger v. Webb*, 391 S.W.2d 664, 667 (Tenn. 1965)). One application of this doctrine occurs "where the remedies are so inconsistent or repugnant that pursuit of one necessarily involves negation of the other." *Id.* (quoting *Wimley v. Rudolph*, 931 S.W.2d 513, 515 (Tenn. 1996)). Mr. McArthur argues that, by accepting payments from Mr. Ross and agreeing to sell their lot back to him, the Shearers elected their remedy and cannot also enforce the option agreement.

As to Mr. Ross, however, the trial court found that there was no legally enforceable remedy:

Mr. Ross testified with regard to whether or not they [he and the Shearers] had a contract or an agreement. He said, well, we don't have anything in writing.

And he admitted that the payments that he was sending to her for interest were coming from multiple different accounts, the names of different groups, and that he didn't have any specific agreement to buy it back, just that he would do what he could, he hoped that he could. And I think that's sufficient for this Court to then find that there was not a meeting of the minds on a contract with Mr. [Ross] . . ., and so that doesn't give rise to an election of remedy then by the plaintiffs as it applies to this particular case.

The evidence does not preponderate against the trial court's finding that there was no meeting of the minds between Mr. Ross and the Shearers and, therefore, no enforceable contract. Based upon these findings, we agree with the trial court's conclusion that there was no election of remedies.[4]

CONCLUSION

The decision of the trial court is affirmed. Costs of appeal are assessed against the appellant, Mr. McArthur, and execution may issue if necessary.

_____

ANDY D. BENNETT, JUDGE

---

[4]The interest payments received by the Shearers from Mr. Ross have been taken into account by the parties and are not at issue on appeal.