**A.W. WILLIS, Jr., Successor Executor of the Estate of Chew Cornelius Sawyer, et al., Plaintiff-Appellee,**

v.

**Mary SMITH, Defendant-Appellant,**

and

**Universal Life Insurance Company, Successor in Interest to Union Protective Life Insurance Company, Appellee.**

Court of Appeals of Tennessee, Western Section, at Jackson.

Nov. 2, 1984.

Application for Permission to Appeal Denied by Supreme Court Jan. 22, 1985.

Prince C. Chambliss, Jr. and Teresa J. Sigmon of Armstrong, Allen, Braden, Goodman, McBride & Prewitt, Memphis, for defendant-appellant.

Ray A. Bratcher of Pierce, Rice, Bratcher, Nichols & Stone, Memphis, for plaintiff-appellee.

Walter L. Evans and Rita L. Stotts, Memphis, for Universal Life.

Herman Morris, Jr., Memphis, for Tri-State Bank.

TOMLIN, Judge.

A.W. Willis, Jr., as executor of the estate of C.C. Sawyer, deceased, filed this action against Universal Life Insurance Company, Tri-State Bank, and Mary Smith, the mother of C.C. Sawyer's widow, to recover the value of certain corporate stock and dividends that had been wrongfully converted to the detriment of the estate he was administering.[1] Universal filed a cross-claim against Mary Smith for indemnification. The Chancery Court of Shelby County awarded plaintiff a judgment against both Mary Smith and Universal for the value of the stock plus certain dividends paid thereon. Universal was awarded a judgment for the value of the stock on its cross-claim against Mary Smith. Mary Smith is the only defendant appealing. Plaintiff has appealed only as to the failure of the chancellor to award prejudgment interest. Universal has not appealed. Therefore, we will at times use the term "defendant" in its singular form to refer to Mary Smith only.

Defendant, by her appeal, presents a bushel basket of issues for this Court to consider, some eight in number. Defendant contends that the chancellor erred (1) in holding that the plaintiff's claim was not barred by the statute of limitations, Tennessee Code Annotated § 28–3–105; (2) in holding that plaintiff's claim was not barred by laches and estoppel; (3) in not holding that plaintiff's decedent owned the stock as tenants by the entirety with his late wife; (4) in admitting stock certificates and related affidavits without a proper foundation; (5) in failing to give defendant

---

1. A.W. Willis, Jr. will be referred to as "plaintiff"; defendant Mary Smith as "Mary Smith" or "defendant"; Universal Life Insurance Company as "Universal"; and Tri-State Bank as "Bank."

Though not a defendant, the Union Protective Life Insurance Company is involved in this litigation and will be referred to as "Union Protective."

credit for one-third of the amount of the recovery in accordance with a prior settlement pertaining to estate assets; (6) in giving plaintiff a judgment for the amount of dividends paid on the stock; (7) in giving judgment for Universal on its cross-complaint against defendant; and (8) in dismissing the bank from the lawsuit.

C.C. Sawyer died testate in September, 1973. The beneficiaries under his will were certain brothers and sisters along with his widow Helen Sawyer, who was named executrix. Several months elapsed before Helen Sawyer could be persuaded to open her husband's lockbox, take inventory of same and enter his will for probate. His lockbox was opened and inventoried in her presence in March, 1974. The inventory was signed by her as one of the witnesses. Among the assets included therein was Certificate No. 181 for 20 shares of stock in Union Protective, issued to C.C. Sawyer in 1958. In 1970, the Union Protective stock split five to one. Thus, the certificate represented 100 shares.

The largest beneficiary under Sawyer's will was his sister, Othella Sawyer Shannon. That there was substantial open hostility between Othella and Helen is well documented in the record. It appeared at that time that Sawyer's estate might be insolvent. For this reason, and perhaps others, Helen Sawyer elected to dissent from the will and withdrew in her capacity as executrix in September, 1974. Shortly thereafter plaintiff was appointed as successor executor. When plaintiff assumed his responsibilities as executor Mrs. Sawyer turned over to him the contents of her late husband's lockbox, which included Certificate No. 181 for 20 shares of Union Protective stock. In connection with the settlement of Sawyer's estate, first Mrs. Sawyer and then the plaintiff were represented by The Honorable H.T. Lockard, now a circuit judge in Shelby County.

At the time of his death C.C. Sawyer owned stock in several companies, as well as owning considerable real estate. Several of his heirs conveyed to the plaintiff their opinion that Sawyer owned substantially more assets than those revealed by the inventory of his lockbox. However, because of the resistance and attitude of Sawyer's widow, plaintiff was unable to determine the existence of any additional assets. Plaintiff testified that Mrs. Sawyer advised him that the assets from the deceased's lockbox that were turned over to him were "all that there was" and that she knew nothing about additional assets.

In October, 1976, after substantial negotiations between the parties, a settlement agreement was reached by all of the beneficiaries of Sawyer's estate. At that time Mrs. Sawyer was represented by independent counsel. Prior to execution of the agreement its contents were discussed in detail in Mrs. Sawyer's presence and in the presence of her counsel. The agreement was ultimately approved by her when she signed the document. Among other things it provided that the shares of Union Protective stock represented by Certificate No. 181, the only stock in that company known by the plaintiff to be in existence, would ultimately belong to the deceased's sister, Othella Shannon. Furthermore, this settlement agreement provided that should other assets of C.C. Sawyer be discovered subsequent to the date of execution of the agreement they were to be divided in such a way that Mrs. Sawyer would receive one-third of the "subsequently discovered assets." At this point it should be noted that the defendant, Helen Sawyer's mother, had moved into the Sawyer residence shortly after the death of C.C. Sawyer in 1973 and was aware of the agreement. Sawyer's widow proceeded to take those assets assigned to her under the agreement.

In January, 1977, Helen Sawyer died intestate, leaving the defendant, her mother, as her sole heir. A friend of Mrs. Sawyer's, Martha House, was appointed administratrix of her estate. The Honorable George Brown represented Mrs. House in her administrative capacity. Mrs. House received only such assets as Mary Smith turned over to her. She made no active search for any assets. The estate was duly administered by Mrs. House and was

closed in September, 1979. There were no shares of Union Protective stock listed as assets of Mrs. Sawyer's estate.

In October, 1980, pursuant to a merger arrangement, Universal agreed to purchase all of the outstanding capital stock of Union Protective for $48 per share. At that time the estate of C.C. Sawyer was still open due to the inability of plaintiff to obtain waivers and receipts from some of the beneficiaries and other problems. Among the assets then remaining in plaintiff's possession was Certificate No. 181 of Union Protective, representing 100 shares of stock due to the stock split heretofore mentioned. Plaintiff tendered this certificate to the escrow agent, the Tri-State Bank, for redemption. It was at this time that plaintiff discovered that the name C.C. Sawyer did not appear as an owner of capital stock in Union Protective on the stockholder list submitted to Universal by Union Protective in connection with the merger and acquisition. Upon making this startling discovery, plaintiff contacted Universal and upon investigation at plaintiff's request discovered the following facts that form the basis of this litigation, for up to the present time one might truly ask, "where's the beef"?

Much to plaintiff's surprise and shock it appears that on January 7, 1975, only four months after surrendering her deceased's husband's assets to the plaintiff, Helen Sawyer filed an affidavit with Union Protective which stated in substance that she was the legal owner of Certificate Nos. 181 and 174, for 20 and 60 shares respectively, that had been issued to her deceased husband, C.C. Sawyer. The affidavit further stated that she had been unable to locate the two certificates, and that to the best of her knowledge they had either been lost or misplaced. This was the first time that plaintiff had ever heard of the existence of Certificate No. 174 for 60 shares (worth at that time 300 shares by virtue of the split). It was news to plaintiff's counsel as well.

At the time the affidavit was made and submitted to Union Protective, Helen Sawyer was well aware that only nine months before she had participated in the inventory of her deceased husband's lockbox in which Certificate No. 181 was found and that in September, 1974, she had surrendered that certificate to the plaintiff as the successor executor of her deceased husband's estate. By the same token, she had to be aware that under the will she was not entitled to possession or ownership of either certificate.

Notwithstanding that Union Protective knew that C.C. Sawyer was deceased, on the strength of Helen's affidavit alone, with no inheritance tax waivers or copies of letters testamentary being filed with the company, it issued Certificate No. 443 for 400 shares in the company to Helen Sawyer to replace the 400 shares represented by the two "lost or misplaced" certificates.

Helen continued her fraud when some 20 months after she acquired the stock in her name she participated in the settlement of the estate by being a signator to the settlement agreement. The agreement called for the stock represented by Certificate No. 181 to be transferred to Othella Sawyer Shannon. Helen also knew that she was in possession of 300 more shares represented by Certificate No. 174, unknown to the other beneficiaries. She obviously made no revelation of this fact to anyone except her mother, the defendant, who, following Helen Sawyer's death, discovered that this certificate was in a chest of drawers in the Sawyer home.

Defendant made this discovery sometime prior to August, 1979, at which time she submitted the certificate to Union Protective, accompanied by an affidavit stating that she was the sole heir-at-law of Helen Sawyer, deceased, who died intestate. Again, based solely on this affidavit, on August 18, 1979, Union Protective issued Certificate No. 462 to the defendant for 400 shares of its stock. This transfer occurred prior to the closing of Helen Sawyer's estate by Mrs. House, the administratrix. Mrs. House testified unequivocally that she was never informed about the Union Protective stock and that it was not shown as an asset on the inheritance tax return filed

by her as administratrix. The climax of this drama occurred when defendant, as a listed stockholder of Union Protective stock, was notified, along with all of the other stockholders of Union Protective, that she should surrender her certificates to the bank for compensation pursuant to the merger agreement between Union Protective and Universal. Defendant did so and received a check in the amount of $19,200.

After these facts became known to plaintiff and defendant refused to pay over the $19,200 to plaintiff on behalf of C.C. Sawyer's estate, this suit was brought in December, 1980.

The chancellor made the following findings of fact:

1. Mr. Chew Cornelius Sawyer died intestate (sic) in September of 1973. The decedent's safety deposit box was inventoried shortly thereafter in the presence of his widow, Helen A. Sawyer who witnessed the inventory. In addition to other items, the safety deposit box included twenty shares of Union Protective Life Insurance Company stock issued in 1958, but subsequently split five-for-one, making this old certificate worth 100 shares of Universal Life Insurance Company, the successor to Union Protective Life Insurance Company.

2. In March of 1974 Chew C. Sawyer's will was admitted to probate and Helen A. Sawyer was appointed executor (sic) of the estate in cause number 101082 in probate court of Shelby County, Tennessee. In 1974 A.W. Willis was appointed successor executor of the estate, the estate is still active and has never been closed, and A.W. Willis, Jr. is still the successor executor of the estate.

3. On January 7, 1975 Helen A. Sawyer executed and filed affidavits with Union Protective, stating that the twenty share stock certificate, found in the deposit box and known to be in the possession of the executor, and another certificate of sixty shares also in the name of C.C. Sawyer, had been lost or misplaced and that she was entitled to them. She was then issued a new certificate of 400 shares representing the current value of the eighty old shares without any proof of her right to those shares except her own affidavit.

4. On October 25, 1976 Helen A. Sawyer and other beneficiaries of C.C. Sawyer concluded a settlement of the estate which was incorporated in an order filed in the cause. Even though Helen A. Sawyer knew that she had already improperly transferred the twenty (one hundred) shares the executor had in his possession and another sixty (three hundred) shares belonging to the estate that she had concealed from the executor, to herself, she nevertheless concluded the agreement conveying one hundred shares, all that the executor and the other parties knew anything about to Othella Shannon.

The court finds that her action constituted conversion and fraud.

Helen A. Sawyer lived with her daughter (sic) Mary Smith for a time before her death on January 13, 1977 and the four hundred share stock certificate was kept in their possession in their home.

5. On August 25, 1979 Union Protective Life Insurance Company transferred the four hundred share certificate of stock from Helen A. Sawyer to her daughter (sic) Mary Smith.

6. On October 2, 1980 Mary Smith "cashed-in" the four hundred shares for $19,200.00.

7. In October, 1980 A.W. Willis, successor executor, attempted to "cash-in" the twenty (one hundred) share certificate he held and learned that Helen A. Sawyer had converted that stock and also had converted sixty (three hundred) other shares belonging to the estate that he had not known about.

8. Between 1972 and 1980 Union Protective had paid $720.00 in stock dividends on the subject stock.

██ Since this case was tried by the chancellor sitting without a jury, our review is de novo upon the record of the trial court accompanied by a presumption of correctness of the findings of the chancellor.

Absent an error of law, unless the proof preponderates against his findings, we must affirm. Tenn.R.App.P. Rule 13(d). With this in mind, we will now consider the principal issues presented by this appeal.

## I. STATUTE OF LIMITATIONS, LACHES AND ESTOPPEL.

We have chosen to consider these three issues together because of their close relationship. We consider first the defense of the statute of limitations. The principal thrust of plaintiff's complaint is a suit for conversion. The applicable statute of limitations is T.C.A. § 28–3–105(2), which provides that an action for conversion must be brought within three years from the accrual of the cause of action. The principal issue faced by the chancellor and by this Court as well is, under the facts and circumstances of this case, when did plaintiff's cause of action "accrue"? In *Prescott v. Adams*, 627 S.W.2d 134 (Tenn.Ct. App.1981) *cert. denied* (1982), the Middle Section of this Court stated:

> It seems clear, then, that in a suit for property damages under T.C.A. § 28–3–105, the cause of action accrues at the time the injury occurs, or when it is discovered, or when in the exercise of reasonable care and diligence the injury should have been discovered. The question in the instant case is when should the plaintiffs have reasonably known that their cause of action existed.

*Id.* at 138.

■ Capsulating the facts that pertain to this issue, the record, in the opinion of this Court, clearly supports the finding that Helen Sawyer fraudulently and intentionally concealed from the plaintiff the existence of Certificate No. 174 of Union Protective stock and obtained the stock represented by Certificate No. 181 by her fraudulent actions. She represented to plaintiff that Certificate No. 181 was all that she had in her possession. She compounded the fraud when she signed the settlement agreement in September, 1976, knowing that she already had "title" to the stock and had secreted the certificate away in her bureau drawer.

The fraudulent misconduct of Helen Sawyer in this regard provided the foundation for her mother, Mary Smith, to prolong the concealment of these facts from plaintiff. While Mary Smith's conduct is not quite so tainted as that of her daughter, it nonetheless was willful and prevented discovery by plaintiff. The proof shows that defendant was aware of the agreement that her daughter signed settling the estate in 1976. Further, the proof reveals that after her daughter's death, but before the estate was settled, defendant had become aware of the Union Protective stock certificate that was kept in the dresser drawer in her home. However, she did not advise her daughter's administratrix of the existence of this stock certificate so that it might be included in her daughter's estate. Rather, when called upon to do so by Universal, she surrendered it for redemption, pocketing the cash.

■ We think the Supreme Court in *Vance v. Shulder*, 547 S.W.2d 927 (Tenn. 1977) clearly sets forth the law applicable to the case at bar:

> "Mere ignorance and failure of the plaintiff to discover the existence of a cause of action is not sufficient to toll the running of the statute of limitations. *Hall v. DeSaussure*, [41 Tenn.App. 572, 297 S.W.2d 81 (1956)], and numerous cases. There is an exception to this rule. Fraudulent concealment of the cause of action by the defendant tolls the statute of limitations. It begins to run as of the time of the discovery of the fraud by the plaintiff. *Boro v. Hidell*, 122 Tenn. 80, 120 S.W. 961 (1909); *Bodne v. Austin*, [156 Tenn. 353, 2 S.W.2d 100 (1928)]; *Howell v. Davis*, [43 Tenn.App. 52, 306 S.W.2d 9 (1957)]; and numerous cases. To come within this exception, the plaintiff must prove that the defendant took affirmative action to conceal his cause of action and that he, the plaintiff, could not have discovered his cause of action despite exercising reasonable diligence. *Redwood v. Raskind*, 49 Tenn.App. 69, 350 S.W.2d 414 (1961); *Hudson v. Shoul-*

*ders,* 164 Tenn. 70, 45 S.W.2d 1072 (1932); *Woodfolk v. Marley,* 39 S.W. 747 (Tenn.Ch.App.1896), *aff.* 98 Tenn. 467, 40 S.W. 479 (1897); *Patten v. Standard Oil Co. of Louisiana,* 165 Tenn. 438, 55 S.W.2d 759 (1933); *Ray v. Scheibert,* 224 Tenn. 99, 450 S.W.2d 578 (1959); see 51 Am.Jur.2d, Limitations of Actions, § 148 pp. 719–720."

*Id.* at 930–31.

■ In our opinion, plaintiff clearly falls within the exception noted above. He has proven that the defendant and those in privy with her took affirmative action to conceal plaintiff's cause of action, and further that through the exercise of reasonable diligence, plaintiff could not have discovered the existence of circumstances that would have or should have alerted him to the fact that he had a cause of action.

In the due course of events the only time plaintiff could have reasonably discovered the fact that C.C. Sawyer's estate had been defrauded by Mrs. Sawyer would have been following notification by Universal of the redemption of Union Protective stock, when he attempted to cash in Certificate No. 181. While it might be said that the better course of conduct for an executor would be to correspond with all the companies in which the deceased was known to have owned stock, we cannot say that plaintiff's failure to do so constituted lack of due diligence on his part. Under the facts we hold that the plaintiff's cause of action "accrued" in October, 1980. Inasmuch as this action was filed two months later, it was well within the statute of limitations.

■ As for laches and estoppel, we are of the opinion that these defenses are less meritorious than the statute of limitations defense. This Court described the defense of laches in *Clark v. American National Bank & Trust Co.,* 531 S.W.2d 563 (Tenn. Ct.App.1974) *cert. denied* (1975).

Laches is actually based on equitable estoppel and is dependent upon the facts and the equities of each individual situation. *State ex rel. v. Abernathy, supra* and *Hamilton Nat. Bank v. Woods* (1948

E.S.), 34 Tenn.App. 360, 238 S.W.2d 109 . . . .

Long delay alone in the prosecution of a claim is insufficient for the application of the doctrine of laches. The present circumstances of the parties must be considered. There must be actual acquiescence or that implied from the circumstances of the case, in the conduct of the defendant. Whether or not such exists is dependent upon the facts. And whether the facts are sufficient is dependent upon the Court applying those facts. One Court may reach a different conclusion than another. Initially, we could find no factual condition in the record, as we reviewed it, that would put the complainant-beneficiaries on reasonable inquiry or notice of the complained of exchange which, therefore, "tolled the running" of the doctrine of laches.

*Id.* at 573.

Defendant's contention that laches or estoppel should bar plaintiff's claim because of his failure to discover the fraud sooner is totally without merit. Under the facts as established in this case we have already held that plaintiff, as an executor, exercised due diligence. Defendant seeks to present herself as an innocent victim. While her conduct does not reach the depths reached by her daughter, we cannot and do not conclude that she is an innocent party in these events.

## II. ADMISSIBILITY OF THE AFFIDAVITS AND STOCK CERTIFICATES.

Defendant contends that the chancellor committed error in admitting into evidence the various stock certificates reissued by Union Protective, as well as the affidavits of defendant and Helen Sawyer filed with Union Protective in connection with the reissuance of the stock. Objections were made on the grounds that a proper foundation for a business record had not been laid and that the affidavits were not properly authenticated.

The Uniform Business Records As Evidence Act provides that:

A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or *other qualified witness*, testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

T.C.A. § 24–7–111(c) (emphasis added).

In *Van Zandt v. State*, 218 Tenn. 187, 402 S.W.2d 130, *cert. denied*, 385 U.S. 884, 87 S.Ct. 175, 17 L.Ed.2d 111 (1966), a case involving the interpretation of this code section, the court stated: "The ruling of the trial judge admitting or excluding such records [business records] is given much weight and will not be reversed unless there has been a manifest abuse of discretion." *Id.* 402 S.W.2d at 137 (quoting *Cantrill v. American Mail Line, Inc.*, 42 Wash.2d 590, 257 P.2d 179 (1953)).

 Mr. Payne, an executive vice-president of Union Protective at the time the transaction took place, testified that he knew of the preparation of these records of Union Protective and that he had day-to-day control over the business activities of this aspect of the company. He further testified that the affidavits were attached as part of the business records to the stock transfer books of Union Protective. We hold that the chancellor did not abuse his discretion in admitting these documents in the light of this testimony. We also note that the issue of the admissibility of these documents was made irrelevant by the testimony of the defendant who admitted in her answer that Helen Sawyer, in January, 1975, signed the affidavit concerning the two certificates of Union Protective stock that was used as a basis for the reissuance of the stock by Union Protective to her. Defendant also admitted that she acquired and took possession of the stock after her daughter died, and that she was paid $19,-200 when she surrendered the stock to Universal after the merger.

## III. DIVIDENDS.

 Being consistent to the end, defendant challenges the action of the trial court awarding plaintiff judgment for $720 in dividends paid on the Union Protective stock for the years 1971–1979. This action of the chancellor was entirely appropriate. The stock belonged to C.C. Sawyer and should have been distributed through his estate. Whatever dividends were paid on that stock during those years rightfully belong to the estate of C.C. Sawyer.

## IV. MISCELLANEOUS ISSUES.

Defendant also contends that because C.C. Sawyer and his wife attended shareholders' meetings of Union Protective together in the 1950's, they owned the stock as tenants by the entirety, notwithstanding the fact that the certificate was issued to C.C. Sawyer alone. This is a concept unheard of in the law.

 The C.C. Sawyer estate settlement agreement provided that Helen Sawyer was to receive one-third of any assets "discovered" after the settlement agreement, and thus defendant contends that she should be given credit for one-third of the value of the Union Protective stock pursuant to that agreement. To accept this contention would be to do honor to Helen Sawyer's fraud. This issue has no merit.

## V. THE CROSS–CLAIM OF UNIVERSAL.

 Universal has not appealed the judgment of the plaintiff against it. It is the position of defendant that since Universal committed affirmative wrongs, it should not be entitled to a judgment over against her, as she was guilty of no wrongdoing. Clearly, the basis for the chancellor's finding for the plaintiff against Universal was the fact that the proof showed that Union Protective was negligent in transferring the stock first to Helen Sawyer and then to the defendant solely on the basis of the affidavits submitted to it.

Furthermore, Universal concedes that by virtue of T.C.A. § 48–905(2)(e) it is liable as the successor or surviving corporation for any and all of the liabilities of Union Protective.

Universal did in fact pay fair market value for Union Protective stock. It would clearly be unjust enrichment to allow defendant to profit from the wrongdoings of her predecessor in interest. We cannot say that the evidence preponderates against the decree of the chancellor to place the responsibility upon the defendant, as she was the person who ultimately benefited.

## VI. DISMISSAL OF THE BANK.

The chancellor found that there was no evidence from which to find the bank liable for the plaintiff's loss. It merely acted as an escrow agent for Universal in connection with the merger with Union Protective. Furthermore, defendant filed no cross-action against the bank, and she was, therefore, not prejudiced by their dismissal from this suit. As a matter of fact, in her answer defendant admitted that the bank was guilty of no negligence in paying her for the stock that she surrendered subsequent to the merger.

## VII. PREJUDGMENT INTEREST.

■ "[I]n Tennessee the granting or withholding of interest prior to judgment in cases not falling under the statute is within the discretion of the trial judge." *Johnson v. Tennessee Farmers Mutual Insurance Co.,* 556 S.W.2d 750 (Tenn.1977) (quoting *Farmers Chemical Association v. Maryland Casualty Co.,* 421 F.2d 319, 323 (6th Cir.1970)).

Had plaintiff not been deprived of possession of the stock certificates through the fraud and wrongdoing of defendant and her predecessor in title, the $19,200 could have and would have been paid over to him as executor of C.C. Sawyer's estate in October, 1980. Under these circumstances we think that the failure of the chancellor to allow prejudgment interest from October, 1980, to the date of the judgment amounted to an abuse of discretion.

The decree of the chancellor is affirmed in all respects except as to prejudgment interest. As to this issue the decree of the chancellor is reversed and plaintiff is awarded prejudgment interest from October, 1980, until the date of the judgment. Costs in this cause are taxed to the defendant, for which execution may issue, if necessary.

NEARN, P.J., W.S., and HIGHERS, J., concur.