879 F.2d 1368
 30 ERC 1217, 19 Envtl. L. Rep. 21,458
 ELECTRIC POWER BOARD OF CHATTANOOGA, a Board of the City of
Chattanooga, a Municipal Corporation; Huntsville Electric
Utilities Board, a Board of the City of Huntsville, Alabama,
a Municipal Corporation, Plaintiffs-Appellants,
v.
MONSANTO CO.; General Electric Co.; Central Moloney, Inc.;
Wagner Electric Corp.; Westinghouse Electric Corp.;
Sangamo Electric Corp.; McGraw-Edison Co.; Allis-Chalmers
Corp., Defendants-Appellees.
 No. 88-5372.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 28, 1989.
Decided July 14, 1989.
Rehearing Denied Aug. 17, 1989.
 
 Carlos C. Smith (argued), Edward D. Meyer, Frederick L. Hitchcock, Strang, Fletcher, Carriger, Walker, Hodge & Smith, Chattanooga, Tenn., for The City of Chattanooga.
 J. Bruce Schrimsher, Morring, Schrimsher & Riley, Huntsville, Ala., for Huntsville Elec. Utilities Bd.
 George M. Derryberry, Miller & Martin, Chattanooga, Tenn., for Monsanto Co.
 Silas Williams, Jr., Spears, Moore, Rebman & Williams, Chattanooga, Tenn., for Allis-Chalmers Corp.
 Paul R. Leitner, William E. Godbold, III, Leitner, Warner, Moffitt, Williams, Chattanooga, Tenn., for General Elec. Co.
 Paul R. Leitner, Chattanooga, Tenn., for McGraw-Edison Co., Cent. Moloney, Inc., Wagner Elec. Corp.
 James W. Gentry, Jr., Gentry & Boehm, Chattanooga, Tenn., Richard A. Rothman, Jeffrey S. Klein, Weil, Gotshal & Manges, New York City, James F. Neal (argued), Thomas Dundon, Neal & Harwell, Nashville, Tenn., for Westinghouse Elec. Corp.
 D. Lewis Mattson, Gentry & Boehm, Chattanooga, Tenn., Robert O. King, L. Gary Geddie, Jr., Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, S.C., for Sangamo Elec. Corp.
 Before ENGEL, Chief Judge, BOGGS, Circuit Judge, and COHN, District Judge.*
 BOGGS, Circuit Judge.
 
 
 1
 This is an appeal by the Electric Power Board of Chattanooga (EPBC) and Huntsville Electric Utilities Board (HEUB) from dismissal of their claims against defendants, Monsanto Co. (Monsanto), and General Electric Co., Central Moloney, Inc., Wagner Electric Corp., Westinghouse Electric Corp., Sangamo Electric Corp., and McGraw-Edison Co. (equipment defendants). Allis-Chalmers Corp. was also named as a defendant, but Allis-Chalmers has filed for bankruptcy and all actions against it have been severed and stayed. The district court dismissed all claims, finding that they were barred by either the statute of repose or the tort and contract statutes of limitations, and that federal environmental statutory provisions did not save the claims from being time barred. We affirm on the grounds of the statutes of limitations.
 
 
 2
 * This suit was brought to recover damages for injuries from the presence of polychlorinated biphenyls (PCBs) in certain of EPBC's and HEUB's electrical tranformers (devices which convert variations of electrical current in one circuit into the variations and voltage of another), capacitors (devices which store and stabilize electrical output), voltage regulators (specialized transformers which allow for more precise regulation of electrical currents than ordinary transformers), and other electrical equipment manufactured by the equipment defendants. The equipment defendants are corporations that manufactured and sold the electrical equipment containing PCBs. Monsanto produced the PCBs ultimately incorporated into the electrical equipment manufactured by the equipment defendants. PCBs are chemical compounds which, for safety reasons, have long been used as a cooling fluid in electrical equipment, and which have been regulated by the Environmental Protection Agency (EPA) for more than ten years.
 
 
 3
 This action involves two principal classes of electrical equipment, each of which presents somewhat distinct issues. First, EPBC and HEUB seek recovery for damages from injuries suffered in connection with equipment containing PCBs, produced by the equipment defendants, which was designed and intended to include PCBs. This equipment contains PCBs by design and uniformly contains more than 500 parts per million (ppm) of PCBs; this equipment will be termed "PCB equipment." In addition, EPBC and HEUB purchased other equipment, not designed to contain PCBs, but which does contain 50-499 ppm of PCBs as a result of contamination during the course of the manufacturing process. This equipment will be termed "contaminated equipment." With respect to each class of equipment, EPBC and HEUB sought to recover under theories of restitution, nuisance, negligence, fraud and misrepresentation, strict liability, implied warranty, and express warranty. The two utilities seek to force the defendants to replace some 35,000 pieces of equipment. The majority of the equipment was purchased more than 10 years before this suit was filed; some equipment is as much as fifty years old. All of the equipment was purchased more than four years prior to the commencement of this action.
 
 
 4
 At the outset of the litigation, defendants asserted that most of the causes of action were barred by the Tennessee statute of repose and other statutes of limitations. Tenn.Code Ann. Sec. 29-28-103, et seq. The trial court ordered that the statutes of limitations issue be briefed. However, after disagreements arose as to the proper scope of discovery under that Order, the trial judge directed that all discovery be stayed, and the parties were directed to brief the question of whether the statute of repose, as a matter of law, would preclude any cause of action, or part of any cause of action, stated by the plaintiffs in their complaint. After reviewing the briefs, the trial court ruled that the Tennessee statute of repose barred any part of the EPBC's claims arising under Tennessee law, relating to equipment manufactured by the defendants and purchased by the plaintiffs more than 10 years prior to the date the action was filed. The Tennessee statute was not applied to HEUB because it is an out-of-state plaintiff. This decision was later amended to provide that the Tennessee statute of repose would not bar any of the plaintiffs' claims to the extent that those claims fell within an amendment to the Comprehensive Environmental Response Compensation Liability Act of 1980 (CERCLA), 42 U.S.C. Sec. 9601 et seq. That amendment, codified at 42 U.S.C. Sec. 9658, in essence provided that any state statute of limitations for an action seeking compensation for property damage caused by exposure to a hazardous substance would not commence running until any consequent injury was discovered, regardless of pre-existing state law.
 
 
 5
 The court then proceeded to consider numerous motions for summary judgment submitted by the defendants. The court granted summary judgment to Sangamo on all claims brought against it by EPBC because they were barred by the statute of repose, and the CERCLA amendment did not apply because none of the claims arose from the release of PCBs into the environment. Subsequently, based on similar reasoning, the court dismissed all claims by EPBC against any other defendant for equipment purchased more than 10 years prior to the filing of the action. The court further held that Tennessee's statute of repose did not apply to HEUB, an Alabama entity. The court clarified and amplified this order on April 30, 1987, explaining that the case would proceed as a product liability action for breach of warranty with respect to equipment sold within four years of the date of the action, and as various tort actions regarding items that had caused damages to property within three years of filing the suit. The court added the proviso that, with respect to equipment owned by EPBC, the equipment in question must have been sold within 10 years of the date of commencement of the action. The court also held that the plaintiffs would not be permitted to show fraudulent concealment on the part of the defendants to toll any statute of limitations because the hazards of PCBs have been a matter of public record since at least 1976.
 
 
 6
 Plaintiffs then were allowed to amend their complaint to allege that they were seeking damages for injuries to property caused by the release of PCBs, consistent with the language of CERCLA. The parties were ordered to brief the issue of the effect of this amendment, after which the court held that the amendment did not bring the case under CERCLA, 42 U.S.C. Sec. 9601 et seq., holding that no leaks into the environment causing property damage had occurred within the meaning of that statute.
 
 
 7
 In a series of orders dated February 29, 1988, the court first granted summary judgment on HEUB's claims against Central Moloney. No appeal has been taken from that decision. Second, the court severed the Allis-Chalmers claims and stayed that severed action. Then, the court entered an order severing those claims of the plaintiffs which had not been resolved by the prior orders of the court, and dismissed those claims without prejudice. In addition, although apparently in contradiction, the court granted summary judgment and dismissed the remaining claims of both plaintiffs.
 
 II
 
 8
 The underlying facts are as follows. EPBC and HEUB are public utilities of the cities of Chattanooga, Tennessee and Huntsville, Alabama, respectively. Each operates on a non-profit basis, purchasing electricity from the Tennessee Valley Authority (TVA) under contract with the TVA. As stated above, PCBs are chemical coolants used in electrical equipment for safety purposes. In the early 1970s, Congress's concern over the environmental effects of PCBs prompted hearings and the ultimate passage of the Toxic Substances Control Act, (TSCA), 15 U.S.C. Sec. 2601 et seq., in 1976. TSCA required the EPA to establish rules governing the disposal and labeling of equipment containing PCBs and to control their manufacture, processing and distribution, as well as their disposal. The statute prohibits the use of PCBs at all after January 1, 1978, unless the EPA authorized use in a "totally enclosed manner" upon a determination that use "will not present an unreasonable risk to injury of health or the environment." On May 31, 1979, the EPA published a final rule designating all "intact, non-leaking capacitors, electromagnets, and transformers, other than railroad transformers," as totally enclosed uses and permitting their continued use.
 
 
 9
 In Environmental Defense Fund, Inc. v. EPA, 636 F.2d 1267, 1284-86 (D.C.Cir.1980), the District of Columbia Circuit ruled that there was insufficient evidence in the administrative record to support EPA's classification of transformers, capacitors, and electromagnets as totally enclosed uses. The court invalidated that portion of the May 1979 rule and remanded it to the EPA for further action. Ibid. Those further hearings resulted in a final rule published on August 25, 1982, amending the May 1979 rule. This new rule prohibited the continued use after October 1, 1985, of electrical transformers and electromagnets containing more than 500 ppm of PCBs in or near facilities involved in the handling of food or feed items, and also prohibited the continued use of capacitors containing more than 500 ppm PCBs unless the capacitors were located in restricted access electrical substations or in contained and restricted access indoor areas. The August 1982 rule authorized the continued use for the remainder of their useful lives of all other categories of non-railroad electrical transformers, of capacitors located in restricted access substations and indoor installations, and of other electrical equipment containing less than 500 ppm PCBs. A number of the equipment defendants in this suit, as well as Monsanto, presented information to the EPA supporting the continued use of equipment containing PCBs.
 
 
 10
 On July 17, 1985, the EPA published another final rule placing further restrictions on the continued use of transformers containing more than 500 ppm of PCBs in or near commercial buildings, prohibiting such use after October 1, 1990, and prohibiting further installations after October 1, 1985. This rule also requires the installation of enhanced electrical protection on certain other transformers containing more than 500 ppm PCBs by October 1, 1990. Again, a number of the equipment defendants, as well as Monsanto, participated in the rulemaking process by submitting evidence favoring the use of equipment containing PCBs.
 
 
 11
 The utilities claim that it was the passage of the July 1985 rule that caused them to become concerned over the safety of their continued use of equipment containing PCBs and ultimately led them to file this suit. EPBC believes that the replacement cost for the equipment containing PCBs exceeds ten million dollars; HEUB's estimated replacement cost is in excess of two million dollars.
 
 
 12
 On appeal, the utilities argue that the trial judge erred in ruling that they cannot show fraudulent concealment in an attempt to toll the statutes of limitations because they would be charged with notice of the hazards of PCBs as of 1976. They claim that the trial judge refused to recognize the distinction between the dangers of PCBs free in the environment and their dangers when contained in electrical equipment. They further claim that, as a result, little discovery on this issue took place, but nevertheless, there was adequate evidence to create an issue of fact. The plaintiffs claim that they did not understand that the use of PCBs in electrical equipment could pose a significant threat to human health and the environment until the promulgation of the July 1985 rule. Further, the utilities state that the defendants, individually and collectively, had the resources to discover the dangers of the use of PCBs in electrical equipment earlier, and that they had a duty to discover and inform the plaintiffs thereof because of their role as manufacturers and distributors. They further allege that the defendants, especially Monsanto, had conducted tests and studies which showed the toxic effects of PCBs on the health of humans, and that Monsanto knowingly and falsely represented their safety to the plaintiffs as early as 1971. The plaintiffs charge that Monsanto misrepresented what it knew to be hazardous as safe, and even biodegradable. Allegedly, Monsanto "conspired" with a testing laboratory to present falsified studies to the EPA. Comparable past conduct in connection with other chemicals resulted in the indictment and conviction of a Monsanto employee involved. United States v. Keplinger, 776 F.2d 678 (7th Cir.1985).
 
 
 13
 A number of the defendants are members of a trade association, the National Electrical Manufacturers Association (NEMA). In 1970, General Electric recommended to the NEMA Board of Directors that NEMA create a task force to study problems associated with the disposal of PCB-contaminated materials. The committee was composed of representatives of General Electric, McGraw-Edison, Sangamo, Westinghouse, and Central Moloney. In 1970, the committee recommended that NEMA join with Monsanto in establishing an industry committee under the auspices of the American National Standards Institute (ANSI) to study the use, maintenance, and disposal of PCBs in electrical equipment. One of the purposes of the committee was to avoid "any governmental restrictions [being] placed on the production of this material [PCBs]." As a result, the ANSI committee, designated C-107, was created and staffed by NEMA. The plaintiffs claim that the ANSI committee, as well as NEMA, helped to conceal the dangers of PCBs from regulatory authorities and users, and provided a means for the submission of false and misleading information to the EPA. For example, in a March 19, 1975 letter, Monsanto wrote to Westinghouse in response to questions regarding the toxicity of PCBs. Monsanto stated that although "no human harm has resulted" in "over 40 years of experience" with PCBs, "[t]here is a potential real effect to humans--including death." However, NEMA, in its presentation to the EPA in connection with the August 1982 rule, stated that the continued use of electrical equipment containing PCBs posed no threat to human health or the environment.
 
 
 14
 The defendants argue, to the contrary, that the alleged dangers of PCBs in electrical equipment have been the subject of public hearings since 1971, as has the issue of whether leakage of PCBs from equipment requires replacement. The EPA repeatedly has refused to require removal and replacement of all equipment containing PCBs. Further, the utilities closely monitored the extensive congressional and agency proceedings concerning PCBs and do not dispute that they were fully aware of all of the resulting findings and determinations. Despite the claims of the utilities, the defendants assert and document the public nature of the hearings involved in the course of enacting TSCA, the enabling statute, as well as each EPA rule. For example, in August 1971, Congress commenced hearings on the need to regulate PCBs; these hearings culminated in the passage of TSCA. In March 1972, an interdepartmental Task Force of the United States Government issued a comprehensive report which recognized that the primary use of PCBs was in electrical equipment and specifically addressed the alleged dangers and risks associated with the use of PCBs in such equipment. Each EPA rule was preceded by at least one notice in the Federal Register, supporting documents, press releases and public statements, public meetings, reports and studies, all of which were available to the public through the EPA. In March 1980, based on reports submitted by utility industry representatives that PCBs tend to "weep" or "sweat" from electrical equipment, the EPA published a notice in the Federal Register specifically requesting information on the incidence and hazards of such leaks from all utility companies. There is no indication that either EPBC or HEUB responded to this request.
 
 
 15
 The defendants indicate, and the record confirms, that the utilities reviewed and monitored the public record and proceedings concerning PCBs on a regular basis, and have been aware of the dangers of PCBs since at least 1976. There is unrefuted evidence in the record demonstrating that the utilities participated in the federal regulatory proceedings concerning PCBs in electrical equipment. For example, in May 1982, EPBC filed comments, through the Utility Solid Waste Activities Group, with the EPA actively opposing any further restrictions on the use of PCBs. In those comments, EPBC acknowledged that PCBs "pose a serious threat to humans." Again during the period for public comment on the proposed July 1985 rule, the EPBC filed similar comments "strongly oppos[ing]" the proposed rule.
 
 III
 
 16
 On appeal, the utilities, EPBC and HEUB, argue that they were not on notice of the hazards of PCBs until July 1985, and that they should be allowed to attempt to demonstrate the truth of their claim that the defendants, including Monsanto and the equipment defendants, misled them with respect to the effects of PCBs on the environment and human health. This proof, the plaintiffs claim, would show that the statutes of limitations were tolled until only a month before this suit was filed, in August 1985. Further, the utilities claim that they stated claims and should be awarded damages in tort, nuisance, restitution and all other theories raised in their complaint. They also claim that CERCLA substitutes a discovery rule for all state statutes of limitations in these circumstances. The defendant manufacturers and distributors claim that the district court was correct in determining that the statute of repose bars all claims regarding equipment purchased more than ten years from the date of filing of this suit, and that other statutes of limitations bar the remaining claims on behalf of the utilities. There has been no fraudulent concealment, CERCLA does not apply, and tort and nuisance claims are barred by the statutes of repose and limitation.A
 
 
 17
 The standard of review of a summary judgment is that summary judgment is appropriate when the moving party can show that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 
 18
 In deciding what law applies to a particular case, one must first look to the forum state's choice of law statute. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975). Generally, the procedural law of the forum state applies, including its statutes of limitations. Whitfield v. City of Knoxville, 756 F.2d 455, 461 (6th Cir.1985). Thus, Tennessee law governs the statutes of limitations for all actions brought in this case.
 
 B
 
 19
 As stated above, statutes of limitations are procedural rules and thus the statutes of limitations of the forum state--Tennessee--apply to the claims brought by both the Tennessee and the Alabama plaintiffs. In Tennessee, the appropriate statute of limitations is determined by the type of injuries claimed and the damages sought. The gravamen of most of the claims is injury to property. Actions for injuries to real or personal property must be commenced within three years of the date on which the action accrues. Tenn.Code Ann. Sec. 28-3-105. This would apply to actions in negligence, strict liability, fraud, and misrepresentation as they affect the real property of the utilities.
 
 
 20
 The plaintiffs claim that the statute of limitations for nuisance and restitution is found in Tenn.Code Ann. Sec. 28-3-110. That statute provides that the period of limitations for actions "not expressly provided for" is ten (10) years. Ibid. However, we agree with the district court's conclusion that nuisance and restitution actions, in effect, are tort actions for injury to property, and so are subject to the three year statute of limitations. Tenn.Code Ann. Sec. 28-3-105. Black's Law Dictionary 1180 (5th ed.1979), defines "restitution" as the "[a]ct of restoring; restoration; ...; the act of making good or giving equivalent for any loss, damage or injury...." In other words, restitution is a theory of recovery, not a substantive cause of action in itself. The question is whether one is attempting to restore rights granted and protected by a contract, or trying to vindicate property rights, which are protected by tort law. Here, it is clear that the restitution that is sought is the restoration of property rights protected by various torts actions. Thus, the three year statute of limitations for torts applies. Tenn.Code Ann. Sec. 28-3-105.
 
 
 21
 As regards nuisance actions, Black's Law Dictionary 961 (5th ed. 1979), defines "nuisance" as "[t]hat which annoys and disturbs one in possession of his property, rendering its ordinary use or occupation physically uncomfortable to him." Thus, nuisance law comes under the broad umbrella of "injury to property," which also is covered by Tenn.Code Ann. Sec. 28-3-105, the three year statute of limitations.
 
 
 22
 Finally, breach of warranty actions are covered by Tenn.Code Ann. Sec. 47-2-725, which provides for a four year statute of limitations. However, a claim accrues under this statute "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Tenn.Code Ann. Sec. 47-2-725(2).
 
 
 23
 Therefore, because all of the equipment involved in this dispute is at least four years old, all of the plaintiffs' claims are time-barred by the various three and four year statutes of limitations. The only exception would be if the plaintiffs can show: (1) that their claims accrued later than four years ago; (2) that the statutes were tolled by the fraudulent concealment of the hazards by the defendants; or (3) that CERCLA applies, and establishes a different statute of limitations than those provided by Tennessee law.C
 
 
 24
 Ordinarily, a claim accrues when the plaintiffs discover their injury or "through the exercise of reasonable care and diligence [it] should have been discovered." McCroskey v. Bryant Air Conditioning Co., 524 S.W.2d 487, 491 (Tenn.1975). In the instant case, the trial judge found that, at the very latest, the claims accrued in 1976. However, the plaintiffs argue, first, that the claims did not accrue until July 1985; and second, that the statutes of limitations were in any event tolled by the fraudulent concealment of the hazards by the various defendants. The initial complaint in this action was filed on August 23, 1985. Thus, unless the claims accrued after 1981 in the case of the warranty claim, and 1982 in the case of the tort claims, those claims are barred, as the trial court found they were.
 
 
 25
 As regards the warranty claim, the claim accrues "when tender of delivery is made" regardless of the lack of knowledge of the breach. Tenn.Code Ann. Sec. 47-2-725(2). Thus, if a breach of warranty occurred at all, it occurred when the equipment was sold. Clark v. DeLaval Separator Corp., 639 F.2d 1320, 1324-25 (5th Cir.1981). Therefore, any claim for breach of warranty by either plaintiff regarding equipment purchased more than four years ago is barred. The defendants contend that all of the equipment was purchased more than four years before this suit was commenced. The plaintiffs did not contest this allegation below or on appeal. Thus, we agree with the conclusion of the district court that all breach of warranty claims are barred by the statute of limitations.
 
 
 26
 As regards the tort claims, the question of when the claims accrued is more complex. The utilities make two arguments regarding this issue: first, they contend that they did not know of the hazards of PCBs in electrical equipment until July 1985, when the EPA finally declared that use of PCBs to be hazardous. Second, they contend that the defendants fraudulently concealed the hazards from the utilities and the EPA, and so the statutes of limitations should have been tolled under equitable principles.
 
 
 27
 As regards the first argument, the trial judge found as fact that the utilities knew or should have known of the hazards of PCBs by 1976 at the latest. We do not find it necessary to specify the earliest date on which we believe the utilities knew or should have known of the hazards of PCBs in electrical equipment. It is sufficient to conclude that the record shows with crystalline clarity that the utilities had actual knowledge of the hazards of PCBs as used in electrical equipment more than three years before they filed this suit. It is clear that the utilities participated in the public rulemaking procedures conducted by the EPA, and opposed restrictions on the use of PCBs in their equipment consistently, during the 1970s and early 1980s. For example, the interdepartmental Task Force issued a March 1972 report which recognized that the principal use of PCBs was in electrical equipment, and addressed the possible hazards of such use. In March 1980, based on reports submitted by utility industry representatives that PCBs tended to "weep" or "sweat" from electrical equipment, the EPA published a notice in the Federal Register specifically requesting information on the incidence and hazards of such leaks from utility companies. The utilities admit that they closely monitored all EPA proceedings relating to PCBs; thus, we may assume that they saw this notice. The utilities had every reason to become wary of the use of PCBs in electrical equipment by March 1980 at the latest. This is more certain in light of the District of Columbia Circuit's decision in Environmental Defense Fund v. EPA, 636 F.2d 1267, 1284-86 (D.C.Cir.1980), in which that court made it clear that transformers and the other types of equipment at issue here are not totally enclosed uses of PCBs, and so are not entirely protected uses.
 
 
 28
 The utilities' arguments to the contrary appear to be specious. The utilities opposed the further regulation of the use of PCBs in electrical equipment because they were concerned about the costs that might result from such regulation. When the regulation they had feared was passed in 1985, only then did they become outwardly concerned about the hazards of their uses of PCB equipment and PCB contaminated equipment. This turnabout on the part of the utilities diminishes the credibility of their claims.
 
 
 29
 This situation can be analogized to what we have called a "traumatic event/latent injury" case. Hicks v. Hines, Inc., 826 F.2d 1543, 1544 (6th Cir.1987). In Hicks, the plaintiff suffered injuries due to exposure to caustic chemicals in his work place. Some of his injuries manifested themselves in 1979; however, almost four years later, the plaintiff developed cancer and attempted to recover damages for this injury. We drew a distinction in that case between "traumatic event/latent injury" cases and "latent injury" cases, in which neither the cause nor the consequences of the injury can be identified until the injury manifests itself. Id. at 1545. Although we recognized that it might be difficult for a plaintiff to sue for both existing and potential future injuries, we held that once a plaintiff is on " 'notice of the invasion of his legal rights,' " ibid. (quoting Albertson v. T.J. Stevenson & Co., Inc., 749 F.2d 223, 232 (5th Cir.1984)), the statute of limitations begins to run, even if all injuries stemming from the traumatic event have not manifested themselves by the end of the running of the statute of limitations. Here, the "traumatic event" analog was general knowledge of the danger of PCBs in electrical equipment. Thus, we find that the district court was correct in determining that the plaintiffs' claims had accrued at least four years before the instant suit was filed.
 
 D
 
 30
 Our holding that the utilities knew of the hazards of PCBs in electrical equipment at least four years before they filed the instant suit negates their fraudulent concealment argument. This court has long held that, to prove fraudulent concealment for the purposes of tolling a statute of limitations, a party must show: "(1) wrongful concealment of their actions by defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir.1975) (citation omitted); Pinney Dock and Transport Co. v. Penn Cent. Corp., 838 F.2d 1445, 1465 (6th Cir.1988) (citing Dayco, 523 F.2d at 394). Further, "[c]oncealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry." Pinney Dock, 838 F.2d at 1467 (citing Wood v. Carpenter, 101 U.S. 135, 143, 25 L.Ed. 807 (1879)). Although this court was reluctant to extend the "affirmative acts" requirement beyond cases involving breaches of fiduciary duties, id. at 1471, the Tennessee courts have not been so reluctant. The Tennessee Supreme Court has stated that a finding "that the defendant took affirmative action to conceal his cause of action" is necessary to maintain a claim of fraudulent concealment. Vance v. Schulder, 547 S.W.2d 927, 930-31 (Tenn.1977) (citations omitted); Willis v. Smith, 683 S.W.2d 682, 688 (Tenn.App.1984).
 
 
 31
 Here, the utilities assert that Monsanto "conspired" with a testing laboratory to present falsified studies to the EPA. Their only proof of this "affirmative action" is that a Monsanto employee had been convicted for similar behavior in the past with respect to other chemicals. United States v. Keplinger, 776 F.2d 678 (7th Cir.1985). The utilities further assert that the defendants acted in concert to conceal information from the EPA, and thus from the utilities, to conceal the plaintiffs' causes of action.
 
 
 32
 There is one major flaw in the plaintiffs' arguments. Even if the defendants took "affirmative action" to conceal the hazards of PCBs in their use in electrical equipment, the utilities cannot meet the second requirement for making out a claim of fraudulent concealment. The trial judge held that the utilities knew or should have known of the hazards by 1976. This court's conclusion is that they knew at the latest by 1980. However, in either case, the utilities knew or should have known of the hazards of the use of PCBs in electrical equipment at least four years before their suit was filed. Thus, they cannot show that they failed "to discover the operative facts that are the basis of [their] cause of action within the limitations period." Dayco, 523 F.2d at 394. Therefore, the utilities cannot make out a claim of fraudulent concealment.
 
 
 33
 In sum, then, the applicable statutes of limitations bar all of the claims alleged in this suit. Thus, the trial court was correct in granting summary judgment to the defendants--unless the utilities are correct that CERCLA negates the effects of the state statutes of limitations.
 
 E
 42 U.S.C. Sec. 9658 provides:
 
 34
 (a) State statutes of limitations for hazardous substance cases.
 
 
 35
 (1) Exception to state statutes. In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such state statute.
 
 
 36
 (2) State law generally applicable. Except as provided in paragraph (1), the statute of limitations established under State law shall apply in all actions brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility.
 
 
 37
 * * *
 
 
 38
 * * *
 
 
 39
 (b) Definitions. As used in this section--
 
 
 40
 * * *
 
 
 41
 * * *
 
 
 42
 (4) Federally required commencement date.
 
 
 43
 (A) In general. Except as provided in subparagraph (B), the term "federally required commencement date" means the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned.
 
 
 44
 The defendants claim that this provision of CERCLA does not apply because the PCBs in this case are allegedly leaking from electrical equipment rather than being "released into the environment from a facility." 42 U.S.C. Sec. 9658(a)(1) (emphasis added). However, even if CERCLA applies to this case, the "federally required commencement date" is virtually identical to the notion of an accrual date under Tennessee law, as discussed above. CERCLA would require a party to commence his or her claim when the party knew or should have known of the cause of action, 42 U.S.C. Sec. 9658(b)(4), as would Tennessee law. McCroskey v. Bryant Air Conditioning Co., 524 S.W.2d 487, 491 (Tenn.1975). As discussed above, that date was at least four years before the suit was filed. Thus, because the instant suit was not commenced until at least four years later, CERCLA's statute of limitations would bar the instant action, just as the Tennessee statutes do. Since accrual in Tennessee occurs at the same time as under CERCLA--when the plaintiff knew or should have known of the availability of the claim--application of CERCLA would not change the result in this case. We find that further analysis of the applicability of CERCLA is unwarranted.
 
 IV
 
 45
 Thus, the applicable Tennessee statutes of limitations bar all of the plaintiffs' claims. Plaintiffs' arguments regarding the accrual date of their causes of action, fraudulent concealment, and CERCLA do not save their claims from this determination. Therefore, we AFFIRM the judgment of the district court dismissing all claims as time-barred.
 
 
 
 *
 The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation